Beverly C. DAGGETT, et al., Plaintiffs,

v.

Peter B. WEBSTER, et al., Defendants.

No. CIV. 98–223–B–H.

United States District Court,
D. Maine.

Jan. 7, 2000.

Order Clarifying Opinion Jan. 14, 2000.

## MEMORANDUM DECISION

HORNBY, Chief Judge.

The remaining issue in this lawsuit challenging the constitutionality of Maine's campaign finance laws is whether the reduced contribution limits can survive. In 1996, Maine voters lowered to $250 the amount anyone can contribute after January 1, 1999, to a State Senate or House candidate. See 21–A M.R.S.A. §§ 1015(1) & (2), 1056(1) (West.Supp.1999). The limits had been $1,000 ($5,000 for PACs, corporations and associations) since 1976. See Pub.L. No.1975 c. 759, codified as 21 M.R.S.A. § 1395(1) & (2) (West Supp. 1977).

The United States Supreme Court is currently reviewing Missouri's contribution limits of $1,075 for Governor, $525 for

State Senator and $275 for State Representative. *Nixon v. Shrink Mo. Gov't PAC* ("*Shrink PAC*"), 1999 WL 813789 (No. 98–963) (oral argument held Oct. 5, 1999). I would prefer to await the Supreme Court's decision in that case so that I could simply follow the Supreme Court's reasoning. But Maine contributors and candidates for the State House and Senate are entitled to a ruling now so that candidates may begin their campaign fundraising for the upcoming election with certainty about what the rules are, if only temporarily. My decision, therefore, is based on the current Supreme Court precedents, particularly the 1976 decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (upholding $1,000 contribution limits for the Presidential, U.S. Senate and U.S. House races).[1]

I hold that Maine's new limits for State House and Senate campaigns are constitutional. The election for governor, on the other hand, is three years away, and no plaintiff in this lawsuit purports to be a candidate for governor. I DISMISS WITHOUT PREJUDICE any challenge to the new gubernatorial contribution limit ($500) as premature. *See Daggett v. Devine,* 973 F.Supp. 203 (D.Me.1997) (dismissing a challenge to the Maine Clean Election Act in part because it was premature).

I have not made the traditional separate findings of fact under Fed.R.Civ.P. 52. As the Court of Appeals recognized in an appeal of an earlier procedural ruling, the

constitutional decision in a case like this is premised largely on "legislative" facts, not the adjudicative facts of Rule 52. *See Daggett v. Commission on Governmental Ethics and Election Practices,* 172 F.3d 104, 112 (1st Cir.1999). Indeed, I have made every effort to stay away from facts or opinions that might be hotly disputed, such as the views of experts or local politicians. Instead, my decision is based largely upon undisputed statistics from Maine campaigns and elections.[2]

### *ANALYSIS*

In light of existing Supreme Court case-law, there are several ways to approach the contribution limits, none of them very satisfactory. Presumably that is why the Supreme Court is revisiting the issue in *Shrink PAC.*

First, one might start with the observation that in *Buckley* the Supreme Court upheld a uniform $1,000 contribution limit for nationwide Presidential campaigns, statewide U.S. Senate races, and district-wide U.S. House of Representatives races. *See* 424 U.S. 1, 23–39, 143, 96 S.Ct. 612, 46 L.Ed.2d 659. That $1,000 limit still is in effect. *See* 2 U.S.C.A. § 441a(a)(1)(A) (West 1997). If that limit is constitutional for federal races nationwide—such as California's, New York's and Texas's statewide U.S. Senate races—then Maine's limit of $250 for its much more restricted State Senate and House races easily conforms

---

1. I am aware of the many trial and appellate court cases on this topic in the 24 years since *Buckley* first addressed the issue. The limits struck down (the vast majority of cases) have ranged from $100 to $1,075. *See, e.g., Carver v. Nixon,* 72 F.3d 633 (8th Cir.1995) (declaring unconstitutional a $100 contribution limit); *Shrink Mo. Gov't PAC v. Adams,* 161 F.3d 519 (8th Cir.1998) (declaring unconstitutional a $1,075 contribution limit), *cert. granted sub nom Nixon v. Shrink Mo. Gov't PAC,* 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999). Those upheld have ranged from $500 to $1,000. *See, e.g., Alaska v. Alaska Civil Liberties Union,* 978 P.2d 597 (Alaska 1999) (up-

holding a $500 contribution limit); *Kentucky Right to Life, Inc. v. Terry,* 108 F.3d 637 (6th Cir.1997) (upholding a $1,000 contribution limit). There are no pertinent First Circuit opinions. My analysis here does not deal with or attempt to harmonize this multitude of trial and appellate decisions from other jurisdictions. Because the Supreme Court is on the verge of making a new pronouncement in *Shrink PAC,* those lower court precedents seem particularly fragile. Therefore, I limit myself to controlling Supreme Court precedents.

2. I discuss the judicial factfinding role for this kind of case at greater length in an Appendix.

by any proportional measure.[3] Put another way, if Maine's new limit had been presented to a court the month after *Buckley* was decided, the plaintiffs would have been hard pressed to argue that it was unconstitutional. Until the Supreme Court overturns *Buckley* and invalidates the existing $1,000 limit for federal campaigns, a lower court must have great temerity to upset state limits like Maine's that are in rough proportion to the *Buckley* amounts.

Alternatively, one might look at the purchasing power of the dollar. *Buckley* was decided in 1976. The $1,000 limit the Supreme Court upheld then would be $2,870 in today's dollars. *See* T. Decl. of John R. Lott, Jr. ¶ 72. Viewed in that context, Maine's $250 limit is low. It may not be justifiable even with Maine's more restricted geography, population and available media. Under this approach, the $1,000 limit approved in *Buckley* is suspect; perhaps it still exists only because no one has previously taken a case to the Supreme Court to review it.[4]

A third way is to set aside the numbers and focus on the principles that *Buckley* canvassed in reaching its decision on contribution limits. That, I believe, is the proper approach, most faithful to *Buckley*'s teachings and the role of a trial court. I follow it here.

*Buckley* identified three constitutional interests at stake: contributors' free speech, candidates' free speech, and freedom of association.

### 1. Contributors' Free Speech

According to *Buckley*, "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 20, 96 S.Ct. 612.[5] The Court accordingly gave almost no weight to this independent interest. I do the same.

### 2. Candidates' Free Speech

As for candidates, *Buckley* held that "contribution restrictions *could* have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy."

---

**3.** By "more restricted," I mean that the population and geographic size of a Maine House or Senate district is far smaller than many larger states. Within Maine there are 151 House districts and 35 Senate districts.

**4.** This "indexing" approach is problematic; after all, "it is a Constitution we are expounding." *M'Culloch v. State of Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). The document—and its interpretation—should not be tied to inflation, the cost of living or formulas for campaign costs. The $20 measure for the right to a jury trial in a civil case in federal court, *see* U.S. CONST. amend. VII, still governs us in 2000 even though the worth of that measure dating from 1791 is many times over today. The $100 reporting requirement threshold approved by *Buckley* in 1976 had been in existence since 1910. *See* 424 U.S. at 60–84, 96 S.Ct. 612 (discussing 2 U.S.C. § 434(b)).

**5.** The Court elaborated:

A contribution serves as' a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. ·A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution· but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.
424 U.S. at 21, 96 S.Ct. 612 (footnote omitted).

*Id.* at 21, 96 S.Ct. 612 (emphasis added). The Supreme Court found that such an effect was unproven for the $1,000 limit on federal races at issue in *Buckley.* *See id.* at 21–22, 96 S.Ct. 612.

Here, the parties[6] have devoted enormous effort to provide the necessary proof—or to demonstrate that the effect cannot be proven—by trying to predict the consequences of Maine's reduced limitations on state elections.

The plaintiffs have analyzed the amount by which they believe contributions would have decreased in recent elections if the limits had been in effect. For example, they argue that in 1998 contributions to all candidates for the State House would have declined 16 percent had the limits been in effect; contributions to all candidates for the State Senate would have declined by 33 percent. *See* Daggett Pls.' Corrected Post–Hr'g Br. at 4. In addition to providing figures for the election as a whole, they have analyzed contributions to incumbents and challengers, contributions in "open seat" elections and contributions in "contested" elections (defined as one in which the winner received at least 40 percent but no more than 60 percent of the votes).

The defendants have their own candidate testimony and their own set of calculations, including how many *donors* would have been affected: 757 donors to House campaigns and 908 donors to Senate campaigns in 1998, which represents 3.7 percent of all contributors to House campaigns and 7.1 percent of all contributors to Senate campaigns. *See* Defs.' Trial Br.

at 38, 49 (citing Expert Report of Anthony Corrado at 20).

All parties have done mathematical analyses and tried to compare or contrast the results with what *Buckley* upheld. Not surprisingly, they differ in their assessments of how the new limits will affect campaign contribution and spending behavior. (After all, we are talking about human behavior and how it may respond to changed circumstances, a difficult task at best.) In the end, these are all projections, and the severe impact on political dialogue that *Buckley* said was possible remains elusive.[7]

The one piece of concrete information in the record about the effect of the new limits is the experience of a special election held last year in Lewiston. To the extent that numbers provide the measure, there is every indication that in that election the new limits permitted the candidates to amass sufficient funds for "effective advocacy" and "political dialogue," the only test *Buckley* left us. 424 U.S. at 21, 96 S.Ct. 612. In the abbreviated, seven-week campaign, the victor raised $10,892. The loser, without party backing, raised $5,409. *See* Christie Decl. ¶ 48.[8] Both sums are greater than the average 1998 House campaign cost of $4,725, *see* 1997–98 *Commission on Governmental Ethics and Election Practices Biennial Report* at 16, and spectacularly more than the amount raised in the previous campaign for the seat, $1,190, *see id.* at 20, 96 S.Ct. 612. In short, sufficient resources for effective advocacy in an election remain available to candidates. If there is concrete evidence to the contrary, it has yet to emerge.[9]

**6.** I use the term broadly to encompass the *amici* who were granted *"amicus plus"* status and actively participated in assembling the record, and briefing and arguing the case.

**7.** I do not rely on burden of proof to reach my conclusion on this point, but I observe that the burden of proof to demonstrate that the contribution restrictions have a severe impact on candidates' speech logically should rest with the challengers. If the impact is proven, then the burden would shift to the State to justify this incursion under First Amendment

principles. (*Buckley* did not address this burden of proof issue.)

**8.** The plaintiffs argue, without reference to the record, that in a special election, "[i]t is far easier to raise money [because] there is no competition from other" campaigns. *See* Daggett Pls.' Post–Hr'g Reply Br. at 15 n.6. I have no way to evaluate the accuracy of that assertion as it applies to the Lewiston election.

**9.** Because the constitutionality of Maine's public funding provision for election cam-

### 3. Freedom of Association

The Court's real focus in *Buckley,* so far as contribution limits were concerned, was on freedom of association: "the primary First Amendment problem raised by the [Federal Election Campaign] Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association." 424 U.S. at 24–25, 96 S.Ct. 612. The Court declared that "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." *Id.* at 22, 96 S.Ct. 612. Earlier decisions had established that "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *Id.* at 25, 96 S.Ct. 612 (citations and quotations omitted).

But the Supreme Court went on to say that "[e]ven a significant interference" with this freedom of association could be permitted "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. 612 (citations and quotations omitted).[10] Three governmental interests had been identified in support of the federal contribution limits in *Buckley:* (1) preventing corruption and the appearance of corruption; (2) equalizing the relative ability of all citizens to affect election outcomes, independently of affluence; and (3) braking the skyrocketing cost of campaigns, thereby opening the system more widely to candidates without large sources of money. *Id.* at 25–26, 96 S.Ct. 612. The Court considered and assessed only the first interest: preventing corruption and the appearance thereof.[11]

The Supreme Court counted avoidance of corruption and avoidance of the appearance of corruption each as "sufficiently important" interests under this analysis. Of corruption, it said: "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices *can never be reliably ascertained,* the deeply disturbing examples surfacing after the 1972 election demonstrate that *the problem is not an illusory one.*" *Id.* at 26–27, 96 S.Ct. 612 (emphasis added).

Appearance of corruption also loomed large: "Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from *public awareness of the opportunities for abuse* inherent in a regime of large individual financial contributions." *Id.* at 27, 96 S.Ct. 612 (emphasis added). The Court ruled that a legislature could "legitimately conclude"

---

paigns is still under attack by appeal of my recent decision, *see Daggett v. Webster,* 74 F.Supp.2d 53 (D.Me.1999) (finding constitutional the Maine Clean Election Act public funding program), appealed *sub nom. Daggett v. Commission on Governmental Ethics,* No. 99–2243, Nov. 17, 1999 (oral argument held Jan. 5, 1999), I do not rely upon the availability of public funding in reaching this conclusion. Among other things, the size of the public funding has been attacked as inadequate. If Maine's public funding ultimately is upheld, however, it provides one more basis for concluding that resources for effective advocacy will be available, at least for candidates who avail themselves of that option.

**10.** The Court has made clear that contribution limits require "less compelling justification" than spending restrictions. *See, e.g., FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 259–60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (citing cases). I will not engage in the debate whether the "closely drawn" standard is nevertheless the same as "strict scrutiny." Perhaps the Supreme Court will address that semantic confusion in *Shrink PAC.*

**11.** To date, the Court has recognized only the first as a compelling governmental interest. *See, e.g., FEC v. National Conservative PAC* ("*NCPAC*"), 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).

that this concern about the appearance of corruption was a "critical" interest and required corrective measures to prevent erosion of confidence in the system of representative government. *Id.* (quotation and citation omitted).

Having concluded that the governmental interests were weighty, the Court went on to assess the chosen remedy to see whether there were less restrictive means of dealing with these governmental interests. Criminal bribery laws and disclosure requirements were insufficient alternatives according to the Court. *See id.* at 27–28, 96 S.Ct. 612. Because the $1,000 contribution limit under attack in *Buckley* focused precisely on "large" campaign contributions where the risk of corruption or its appearance was manifest—while leaving open the ability "to engage in independent political expression, to associate actively through volunteering . . . and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources," *id.* at 28, 96 S.Ct. 612—the Court upheld the measure: "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.* at 29, 96 S.Ct. 612.

The Court rejected two separate dollar-overbreadth challenges: first, that the remedy was too broad because most $1,000–plus contributors do not seek improper influence and, second, that the limit was too low because it would take a lot more than $1,000 to actually buy improper influence. *Id.* at 29–30, 96 S.Ct. 612. On the first, the Court ruled that even if most contributors of over $1,000 were properly

motivated, "the interest in safeguarding against the appearance of impropriety" supported the legislative decision to eliminate "the opportunity for abuse" that was "inherent in the process of raising large monetary contributions." *Id.* at 30, 96 S.Ct. 612. As for the height of the ceiling, the Court said that a legislative "failure to engage in . . . fine tuning" of the contribution limit does not invalidate the legislation, and that courts should not probe the amount of the limit. *Id.*

The plaintiffs here maintain that neither corruption nor the appearance of corruption, as recognized in *Buckley*, is a problem in Maine's politics. They argue, therefore, that the "sufficiently important" state interest is lacking. They also maintain that Maine's $250 contribution limit is overbroad and has gone well beyond the Supreme Court's support of a ban on "large" contributions.

### (a) *Actual Corruption or the Appearance Thereof in Maine Politics*

The parties disagree over whether corruption is a threat to Maine's body politic. They also disagree over what corruption is and how it is proven.

The plaintiffs would have me define corruption very narrowly. They quote the language in *NCPAC*, 470 U.S. at 497, 105 S.Ct. 1459, that "[c]orruption is a subversion of the political process" where politicians are "influenced to act contrary to their obligations of office" in exchange for money.[12] They appear to conclude that not much more than an outright bribe would suffice as corruption. The defendants, on the other hand, have a very broad definition that seems to encompass every citizen's suspicion that things are not

---

12. In *NCPAC* the FEC had tried to justify a limit on independent (noncandidate) spending for political advocacy by arguing that politicians might change their position in response to that political speech. That, the Court pointed out, is hardly corruption; it is how the system is supposed to work. *See* 470 U.S. at 498, 105 S.Ct. 1459. Thus, in elaborating upon the conditions of political "corruption"

in *NCPAC*, the Supreme Court was dealing with *expenditure* limitations. (The constitutional constraints are more stringent for expenditure limitations than for contribution limits. *See* n.9, *supra*.) Here, on the other hand, we are talking about direct contributions of cash to a candidate, a much more open invitation to abuse.

as they should be in the State House. The debate is interesting in political science terms, but unedifying in legal terms; much of it centers over the appropriate scope of "influence" in politics, an issue that surely is not for a judge to decide. In any event, I find it unnecessary to endorse either end of the parties' definitional spectrum.[13]

So far as the standards for proving the threat of corruption are concerned, a court must tread very carefully. On the one hand, a state may not simply intone the word "corruption" and thereby overcome all First Amendment obstacles. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.") (citations omitted). On the other hand, I cannot realistically expect chapter-and-verse proof of corruption—that people will come forward and say, "Guess what, I was corrupt!" If that were the state of the evidence, corruption would not be a mere threat. The Supreme Court has been careful to point out that a state does not have to wait for the election process to suffer actual indignities before it can take remedial steps. *See FEC v. National Right to Work Comm.*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982)

("[W]e accept Congress's judgment that it is the *potential* for such influence that demands regulation. Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.") (emphasis added).

What does the record here present? About what one might expect: hearsay about politicians attending events because of contributions, giving easier access to contributions, being urged or pressured to change their votes because of contributors, and so forth—and, at the same time, testimony that there is no evidence of votes actually being bought in Maine, that Maine politicians are not in the Legislature for the money and are at least as honest as elsewhere[14] and that constituents are unduly and unfairly suspicious.

*Buckley* was practical on the subject of proof; it recognized that corruption could "never be reliably ascertained." 424 U.S. at 27, 96 S.Ct. 612. All that it required, therefore, was that the threat not be "illusory." *Id.* Under the previous Maine contribution limits, *see* 21–A M.R.S.A. § 1015(1) & (2) (West 1993) ($1,000 per primary and $1,000 per general election for an individual, $5,000 per primary and $5,000 per general election for PACs, corporations and associations), a single PAC contributing in the primary and general elections could bankroll entirely the average house campaign ($4,725 in 1998, *see* 1997–98 *Commission on Governmental*

---

**13.** Here, the record certainly supports what common sense teaches: contributions bring at least access and influence, whether that process is called corrupt or not. And although I decline to take sides in the political scientists' debate on what really is corruption and on the expert disputes about influence and politics, I recognize that influence cannot be measured solely by what happens on high profile votes. Influence also counts in all the unseen political decisions—the decision on what gets reported out of Committee, the timing of legislation's being taken up on the floor, the creation of the legislative history, are only some examples.

**14.** Unlike some of the other lower courts that have considered this topic, I am skeptical of the argument that a state can justify its laws based only upon conditions within that state's borders. In this information/media age, where citizens are as aware of what is happening in Miami Beach, Florida, and Washington, D.C., as in Rumford, Maine, we cannot demand that either citizens or legislators ignore trends or events elsewhere. National scandals naturally and understandably affect citizens' attitudes toward their own politicians and thus the public awareness of opportunities for abuse.

*Ethics and Election Practices Biennial Report* at 16) and over one-half of the average senate campaign ($18,445 in 1998, *see id.* at 11).[15] An individual contributor could pay for 42.3 percent of the average House campaign and 10.8 percent of the average Senate campaign. Although no contributions of that magnitude have been cited, that ability adequately provided a foundation—not illusory—for public awareness of the "opportunity for abuse," enough under the appearance of corruption standard that *Buckley* endorsed.[16]

Under *Buckley* the appearance of corruption qualifies as a "sufficiently important"—a "weighty"—interest, 424 U.S. at 25, 29, 96 S.Ct. 612.[17] As the Court said in another case, "[p]reserving the integrity of the electoral process, preventing corruption, and 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government' are interests of the highest importance. Preservation of the individual citizen's confidence in government is equally important." *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 788–89, 98 S.Ct.

1407, 55 L.Ed.2d 707 (1978) (citations and footnote omitted).[18]

### (b) Is the Remedy Closely Drawn?

Maine's legislation also meets *Buckley*'s requirement that the measure be focused on where the risk is greatest—the large contribution. The previous permitted contributions of $1,000 by an individual and $5,000 by a corporation or PAC were indeed large. And the effect of the prohibition on freedom of association is limited. As in *Buckley,* the contribution limit "leav[es] persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." 424 U.S. at 28, 96 S.Ct. 612. Moreover, the "contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates,

---

**15.** Or 22.4 percent of 1998's most expensive House race and 14.7 percent of 1998's most expensive Senate race. *See* 1997–98 *Commission on Governmental Ethics and Election Practices Biennial Report* 16, 11.

**16.** That large contributions are rare underscores their risk; if everyone were making them, the risk of special favors would be reduced.

**17.** *Buckley* was hardly the beginning of the concern with this corrupting potential of large contributions. Justice Frankfurter summarized the long history of this topic, starting with the post-Civil War era, in *United States v. UAW–CIO,* 352 U.S. 567, 570–84, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957).

**18.** Only one thing has given me pause concerning the weight of the State's interest here. Specifically, the fourth note in the Statement of Fact accompanying the bill stated: "Election campaign spending is reduced by limiting the amount of money that [PACs], committees, corporations, associations and individuals may contribute to candidates not participating in the [public funding program] and by capping campaign expenditures of

certified [publicly funded] candidates." *See* Statement of Fact accompanying An Act to Reform Campaign Finance, L.D. 1823 (I.B.5), 117th Me. Leg., 2d Reg. Sess., not enacted Mar. 30, 1996(Sen.), Apr. 1, 1996 (House). The statement appeared with the draft bill that the Legislature rejected, and presumably in the petition circulated by the bill's proponents. Arguably, it could be read to suggest that the purpose of the legislation was to limit campaign spending, an impermissible purpose under *Buckley. See* 424 U.S. at 39–51, 143, 96 S.Ct. 612 (striking down FECA's spending limits). I do not so construe it because the Statement of Fact is drafted by the Reviser of Statutes at the Secretary of State's direction in accordance with 21-A M.R.S.A. § 901(5) (West Supp.1999). It appears to be only a description by that officer of what the consequence of the legislation will be. *Buckley* held that contributions could be limited: limiting contributions logically will in turn limit campaign spending.

The search for legislative purpose or motive is always dangerous; it is even more difficult in the case of an initiative or referendum involving all the voters, where it is impossible to know what the multitude read, heard or believed in deciding how to vote.

and political parties." *Id.* at 29, 96 S.Ct. 612.

### (c) Overbreadth

The plaintiffs tell me, however, that the new dollar limit has been set too low—that it is ludicrous to believe a Maine politician would sell his/her political soul for $251, or for any amount up to the preexisting individual contribution limit of $1,000. Indeed, they would go beyond that and offer testimony from another case to suggest that $100,000 is the level at which the threat of corruption sets in. *See* Stearns Pls.' Br. in Lieu of Trial at 30 (citing Lott Dep. II, Ex. C at 86 (Corrado Dep., *FEC v. Colorado Republican Federal Campaign Comm.*, No. Civ. A. 89 N 1159, Nov. 14, 1997)). The defendants and *amici*, on the other hand, say that $250 is still a lot of money to give away in Maine, where the median household income in 1997 was $34,-132. *See* Br. of Maine People's Alliance at 7. Here, we are into what *Buckley* called the analysis of "overbreadth." 424 U.S. at 29–30, 96 S.Ct. 612.

The value of money is relative. Those aware of the cost of campaigns and accustomed to making political contributions might find amounts over $250 to be still modest; personal income and assets also affect the perception. But someone who has never contributed to a political campaign, or whose income and assets are limited, can easily perceive amounts over $250 as, indeed, large, and therefore likely to suggest a *quid pro quo.* What counts as a large contribution might also be measured by the size of other contributions. If a lot of people are contributing at a given level, that given level is no longer large in a relative sense, and the likelihood of corruption or its appearance may be reduced; special favors are more difficult for a multitude. But if the number of contributors at that dollar level is small, the risk is correspondingly greater that the contribution seems large and that special favors—whether votes, access or something else—will result, or that the voters will apprehend that they do. (In Maine elections in 1998, 757 of the 20,717 donors to House candidates gave in excess of $250; in the Senate races, 908 of 12,716 donors gave in excess of $250. *See* Expert Report of Anthony Corrado at 20. The figures are similar for the 1996 election. *See id.* at 21.)

But *Buckley* said expressly that courts are not to probe the amount of the contribution limits chosen in legislation. 424 U.S. at 30, 96 S.Ct. 612.[19] It then added a sentence that "distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.* Since then, courts and commentators have spilled enormous amounts of ink debating just when the size of a contribution dollar limit shifts from a distinction in degree to a difference in kind. The debate has been largely conclusory and unproductive. I do not read *Buckley*'s reference to "distinctions in degree" becoming "differences in kind," as giving lower courts a license to measure and label as unconstitutional contribution limits that permit contributions at more than nominal levels. That is prohibited "probing." As the Supreme Court said in *Buckley*, "[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." 424 U.S. at 30, 96 S.Ct. 612 (quoting approvingly from the Court of Appeals decision). Unless and until the Supreme Court steps away from its contribution limits jurisprudence, limits like Maine's $250 limit are constitutionally permitted.

---

**19.** Indeed, this kind of argument was rejected expressly in *Buckley*. There, the challengers had argued that the $1,000 limit "is unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or office holder...." 424 U.S. at 30, 96 S.Ct. 612. That argument prompted the Court's rejection of requiring the legislation to engage in "fine tuning." *Id.*

Will the new limits in fact resolve the corruption/appearance threat? Will popular distrust of the electoral process and politicians really decrease with a reduction in contribution limits? The answers to those questions are important, but they are more than the First Amendment demands. As a result of the new limits, an individual contribution can no longer be more than a modest percentage of the costs of the average House or Senate campaign. That at least significantly reduces the potential threat for actual corruption from large contributions and, if anyone cares to look, of the appearance of corruption. That, I conclude, is enough for the First Amendment according to *Buckley*—whether or not the measure reduces popular distrust of politicians.

## OTHER ISSUES: POLITICAL PARTIES AND PACs

The plaintiffs have also challenged the limit as it applies to political parties, political action committees and caucus PACs. Previously those limits were $5,000. *See* 21–A M.R.S.A. § 1015(1) & (2) (West. 1993). Now, however, everyone—individual, party, PAC—is subject to the $250 limit. *See* 21–A M.R.S.A. § 1015(1) (individuals), § 1015(2) (committees, corporations, associations), § 1056 (PACs) (West Supp.1999).

■ So far as political parties are concerned, I decline to address the constitutional issue. Federal courts are not to

pass upon the constitutionality of legislation unless there is an actual case or controversy. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Longstanding and respectable reasoning undergirds this restriction on the power of federal courts in dealing with democratically enacted legislation. *See id.*

Here, neither of Maine's major political parties has challenged the contribution limits. Some of the candidates who are plaintiffs say they would like to receive contributions from their party over the new maximum, but that mere desire is too weak to support the constitutional challenge without direct proof that their party is prepared to make such contributions. The Libertarian Party has challenged the new limit, but has been unable to point to any instance where it has made a contribution or wanted to make a contribution in excess of $250. *See* Cenci Dep. at 51 ll. 15–23, 54 ll. 14–18. Its chair predicts that maybe at some point in the future the Libertarian Party will want to make such a contribution, *see id.* at 76 l. 14–77 l. 13, but that is too speculative to ground a constitutional challenge.[20]

So far as contribution limits for PACs are concerned, the Supreme Court has said little. In a short paragraph, *Buckley* upheld a $5,000 limit on "political committee" contributions to candidates. 424 U.S.

---

20. The plaintiffs also call upon the principle that one whose First Amendment interests are not directly attacked may nevertheless challenge legislation that intrudes on someone else's First Amendment interests because that other person may be deterred from challenging it herself. *See* Daggett Pls.' Post–Hr'g Reply Br. at 21 (citing *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)). The argument misses the mark. Overbreadth arguments are used in a First Amendment case where the statutory provision under attack constitutionally can apply to the person attacking it but might be unconstitutional as applied to someone else. *See* 444 U.S. at 633–34, 100 S.Ct. 826. But the person attacking it still must have standing. Here, the

plaintiffs are trying to attack a provision that, except for the Libertarian Party, does not even apply to them, and the Libertarian Party has made no showing that it is realistically affected. As a result, they have no standing. Moreover, there is little call for an overbreadth analysis here. Major political parties have shown little hesitation in challenging campaign laws at both the state and national levels. *See, e.g., Missouri Republican Party v. Lamb,* 31 F.Supp.2d 1161 (E.D.Mo.1999) (challenging state law limits on political party contributions); *RNC v. FEC,* 487 F.Supp. 280 (S.D.N.Y.) (challenging public financing of presidential campaigns), *aff'd,* 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (Mem.).

at 35–6, 96 S.Ct. 612. The challenge there was that the provision's limiting conditions "unconstitutionally discriminate against *ad hoc* organizations in favor of established interest groups and impermissibly burden free association." *Id.* at 35, 96 S.Ct. 612. In a blunt response, the Supreme Court declared: "The argument is without merit." *Id.* The limiting conditions simply "serve the permissible purpose of preventing individuals from evading the applicable contribution limitations by labeling themselves committees." *Id.* at 35–36, 96 S.Ct. 612. The same need to avoid evasion of the limit holds true here. If the individual limits are constitutional, then certainly Maine may limit PACs accordingly.

## OTHER ISSUES: PER CYCLE LIMITS

Finally, the Libertarian Party plaintiffs separately challenge the per election calculation of the contribution limit. They point out that a major party candidate can receive maximum contributions twice, once for the primary and again for the general election. Minor party candidates who have no primary, on the other hand, can receive the maximum contribution only once from any given contributor. They argue that major party primaries are sometimes not hotly contested and, in that event, the calculation permits a major party candidate unfairly to amass more resources for the general election campaign.

At the moment this appears to be a theoretical debate because the record demonstrates that only seldomly have Liber-

tarian party candidates obtained contributions at the maximum level. *See, e.g.*, Dep. of Mark Cenci, Ex. 8 (1998 campaign finance report), Levasseur Campaign Finance Reports (Record File I.F.2), Weinstein Campaign Finance Reports (Record File I.H.2). *Buckley* rejected purely theoretical arguments that minor parties might unfairly be prejudiced by the FEC's contribution limit. *See* 424 U.S. at 31, 33–34, 96 S.Ct. 612. It is sufficient under *Buckley* that the contribution limit does not invidiously discriminate against minor parties.[21] *Id.* at 31, 96 S.Ct. 612. Here, the separate limits are rational and supportable because primary campaigns ordinarily can be expected to require separate and additional expenditures.[22] If actual prejudice ultimately is shown, the matter can then be revisited. *See Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91–98, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (noting that in *Buckley*, the prejudice did not outweigh the governmental interest in disclosure, but that in *Brown* strong record evidence demonstrated prejudice and compelled overturning the Ohio disclosure requirement).

## CONCLUSION

I recognize that the vast majority of lower court decisions have reached conclusions contrary to those I reach here. I believe that in doing so they have not been entirely faithful to *Buckley*'s reasoning permitting contribution limits. There are many practical, political and economic problems with *Buckley*'s approach. Until

---

**21.** On the same basis I reject the assertion that the new limits somehow amount to invidious discrimination against the First Amendment rights of challengers. The argument seems to be that a challenger needs to raise more than an incumbent so as to be able to unseat the incumbent. Assuming that can be proven, it seems equally likely that the contribution limits might help the challenger because they limit the incumbent's access to large contributions that might otherwise be easier for an incumbent to obtain. *See* 424 U.S. at 32–33, 96 S.Ct. 612. There is also the impact of public funding to take into account. In any event, I conclude that this is too specu-

lative an argument upon which to base a constitutional challenge.

**22.** "Many features of our political system— *e.g.*, single-member districts, 'first past the post' elections, and the high costs of campaigning—make it difficult for third parties to succeed in American politics." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 362, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (upholding a Minnesota statute prohibiting a candidate from appearing on the ballot as the candidate of more than one party).

it is overruled or narrowed by the Supreme Court, however, its reasoning permits voters or legislators to set contributions limits with more flexibility than other lower courts have allowed.

In any event, this opinion will have a short shelf life and should be discarded once the Supreme Court decides *Shrink PAC*. That is as it should be. But as a trial judge who has had to grapple with these issues and read a host of campaign finance cases and commentary in the process, I offer the following observations about this important area of constitutional law.

First, the thrust of the Constitution as enunciated by judges should not seem to depend, as it does now in the multitude of lower court decisions, upon the judiciary's evaluation of the particularities of a given state's political experience. If contribution limits are permissible,[23] differences in their level from state to state should reflect democratic choices, not court decisions. Federal courts should not be telling one state that the Constitution requires it to set its contribution limit at a different level than that of another state. The principles of the Constitution are not so narrow. First Amendment jurisprudence that leads to this kind of lower court outcomes is flawed. Those should be legislative decisions.

Second, constitutional standards for governing the electoral process should, of all things, be simple to understand. Elections are the fundamental underpinnings of a democracy. It will not do to say that the First Amendment is a very complicated area, and that difficult choices must be balanced. The First Amendment is on all sides of this question. The voters are entitled to be able to understand what changes they can and cannot make. If their legislators choose not to make the

changes—whether by self interest or by an unbiased sense of what is right for the body politic—the voters should be able to do it themselves without having to go through the process a second and third time because the answers are so unclear. Let us hope that the Supreme Court decision in *Shrink PAC* will bring a much needed clarity to the topic.

## JUDGMENT

The Clerk shall enter **JUDGMENT** for the defendants on Counts One and Two of the Daggett, et al. Complaint, and the First and Second Claims for Relief for the Stearns, et al. Complaint, except as to the challenge of the $500 limit on contributions to gubernatorial candidates, which is **DISMISSED WITHOUT PREJUDICE**, and the challenge to the $250 contribution limit on contributions by political parties, which is **DISMISSED** for lack of standing. Fees and costs are **DENIED**.

. So **ORDERED**.

## APPENDIX

The judicial fact-finding role in assessing the constitutionality of electoral legislation is highly problematic. The evidence a judge is asked to evaluate may never have been presented to the legislature or, in this case, the voters. A judge may be asked to uphold or strike down a law on evidence that did not even exist at the time of its passage. Here, for example, I have been given, and asked to draw inferences from, a poll of Maine citizens' views on campaign finance, corruption and influence, *see* Celinda Lake & David Mermin, *Public Attitudes on Campaign Financing in Maine* (1997), but it was taken after this law was voted into effect. I have also been favored with the divergent opinions of some of

---

**23.** I recognize the argument that limiting contributions has its own set of pernicious consequences and seems to favor independently wealthy candidates, *see, e.g., Colorado Republican Federal Campaign Comm. v. FEC,* 518 U.S. 604, 635–40, 116 S.Ct. 2309, 135 L.Ed.2d 795 (Thomas, J., concurring in the judgment and dissenting in part), but so long as contribution limits are upheld by the Supreme Court, the *amount* of the limits should not suffer intensive second guessing by the judiciary.

America's brightest lights on campaign finance—perhaps expressed previously in other states, but focused on the Maine experience only for this lawsuit. It has made for fascinating reading for a trial judge accustomed to sentencing guidelines—political scientists who have spent their professional lives studying the election process; journalists who have done the same; Chicago School economists (or rational choice theorists) who see it all as a market question (the commodity being governmental largess); and local Maine politicians talking about how they raise money, campaign for votes, and deal with contributors once they are in office. Not only do they vehemently and intelligently disagree with each other, but, in addition, none of this was available to the voters who enacted the law.[24]

Am I, as an unelected judge, to use this new and contested information, then, to uphold or strike down the law?[25] And if I am to make findings about the behavior of Maine's body politic in assessing the constitutionality of the legislation, is my focus to be now, as I make this decision; or as of later in the year, as the campaigns become active; or as of 1996, when Maine voters enacted the law; or as of the last election in 1998; or some other date? The Brandeis brief, from which the practice of courts using data like this appears to derive, presented evidence that would uphold the constitutionality of legislation if it were believed. "Brandeis did not argue that the data were valid, only that they existed." *McCleskey v. Kemp*, 753 F.2d 877, 888 (11th Cir.1985) (quoting Peter W. Sperlich, *Social Science Evidence and the Courts: Reaching Beyond the Advisory Process*, 63 Judicature 280, 285 n. 31 (1980)). In other words, the Brandeis brief presented evidence that the legislature or the voters *could* have accepted if it had been present-

ed, and thus contributed to the presumed constitutionality of legislation.

In the First Amendment context, on the other hand, the Supreme Court has said that the burden of proof to justify legislation is on the state. A judge is therefore presented with data and analyses by an attacking party—data and analyses not available to the voters or the legislature when the statute became law—which the judge is then asked to believe and to use to strike down the legislation. In assessing the evidence a judge is asked to make credibility determinations, where those decisions on credibility might be completely different from what the legislature (or the referendum voters) would make. Here, for example, the parties devote great portions of their briefs to whether I should believe the analysis and conclusions of Colby College Professor Anthony Corrado about the effect of the new contribution limits on Maine campaigns. *See, e.g.,* Proposed Findings of Fact at ¶¶ 174–200; Defs.' Trial Br. at 44–45; Daggett Pls.' Post–Hr'g Reply Br. at 10–15; Stearns Pls.' Reply Br. at 11–19. The dispute is particularly bitter because the plaintiffs first announced that they were going to hire Professor Corrado and gave an early disclosure that he would oppose the reduced contribution limits, as he had in other cases. *See* Pl. Daggett's Designation of Expert Witness at 4–6, *National Right to Life PAC v. Webster*, 1997 WL 703388, No. 96–359–P–H. Ultimately, however, Professor Corrado determined that Maine was different from his other assignments and that the reduced limits were just fine. *See* Corrado Dep. at 243 ll. 6–15, 244 l. 21–245 l. 3. He agreed ultimately to testify for the defendants. It is very troubling that a statute's constitutionality could be so heavily dependent—at least as the parties understand how this area of First Amendment law operates—on how a particular judge might assess the credibility of an

---

**24.** I have also been given a file of press clippings.

**25.** The Edmonds *amici* have proposed some 367 findings of fact to me on the contributions topic. *See* Proposed Findings of Fact.

expert with whom voters and legislators for the most part are unfamiliar.[26]

In addition, I am basically asked to choose sides in a political science debate over the role of money in elections—a debate with respected names and defensible principles on each side, but hardly a debate to which there is a "right" or "wrong" answer in the sense in which juries and judges decide cases.

To be blunt, greater guidance from the Supreme Court on the judicial "factfinding" role in this type of case is highly desirable.[27]

## ORDER ON LIMITED REMAND

The Court of Appeals has requested that I clarify my rejection of the plaintiffs' argument that Maine's $250 limit for private political donations "contribute[s] to the alleged coercion of the public funding scheme." *Daggett v. Commission on Governmental Ethics and Election Practices,* No. 99–2243, slip op. at 2 (1st Cir. Jan. 12, 2000).

To date, I have said that under constitutional requirements any public funding program must be voluntary. *See Daggett v. Webster* ("*Daggett I*"), 74 F.Supp.2d 53, 57–58 (D.Me.1999) (citing *Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 38 (1st Cir.1993)). I have also found that Maine's public funding program is voluntary under the standards set out in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *Vote Choice. See Daggett I,* 74 F.Supp.2d at 57–58. At the time I ruled on voluntariness, I had not yet ruled on the constitutionality of Maine's $250 limit for private

contributions. But I stated that in finding the Maine public funding program voluntary, I assumed for purposes of that decision that the $250 contribution limit ultimately would be upheld. *See id.* at 64 n. 15. Finally, I recently ruled that the $250 private contribution limit itself is constitutional and that it does not starve election debate. *See Daggett v. Webster* ("*Daggett II*"), at 129, 130–31.

I interpret the Court of Appeals's uncertainty about my ruling, therefore, to be as follows: Have I ruled on whether, even if the $250 contribution limit itself is constitutional in isolation, the limit's level somehow prevents a public funding system like Maine's from being voluntary, a requirement under *Vote Choice?* Put another way, even if Maine constitutionally can have a campaign contribution limit of $250 (as I have held), and even if Maine constitutionally can have its public funding program for elections (as I have also held), I am to clarify whether I have ruled on whether Maine constitutionally can have both simultaneously.

The answer is yes. If the $250 limit alone is constitutional—on the basis that it does not starve adequate campaign debate or unduly interfere with freedom of association under First Amendment analysis— then its existence can impair the voluntariness of the choice between private and public funding only if the public funding is so rich by comparison that a candidate has no realistic alternative but to accept public funding. In *Daggett I,* I explained why that was not so and why the financing choice in Maine is realistic. Maine's public

---

**26.** Their focus on the credibility issue is not unique. In *Shrink Mo. Gov't PAC v. Adams,* 161 F.3d 519, 522 (8th Cir.1998), *cert. granted sub. nom. Nixon v. Shrink Mo. Gov't PAC,* 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999), for example, the court struck down Missouri's contribution limits by rejecting as self-serving, conclusory and insufficient a State Senator's observations that corruption was a problem in Missouri politics.

**27.** Recognition of this unresolved problem is recurrent and longstanding. *See, e.g.,* Kenneth L. Karst, *Legislative Facts in Constitutional Litigation,* 1960 Sup.Ct. Rev. 75; Archibald Cox, *Constitutional Issues in the Regulation of the Financing of Election Campaigns,* 31 Clev. St. L.Rev. 395, 407–18 (1982); William E. Lee, *Manipulating Legislative Facts: The Supreme Court and the First Amendment,* 72 Tul. L.Rev. 1261 (1998).

funding system imposes initial fundraising burdens (seed money and qualifying contributions) that a privately financed candidate does not bear, *see* 21–A M.R.S.A. § 1125(2) & (3) (West Supp.1999), and there is a fixed ceiling (twice the original distribution) above which public funding cannot go, *see id.* at § 1125(9), whereas private contributions—though individually limited in amount—are unlimited in volume, *see id.* at §§ 1015(1) & (2), 1056(1). The $250 contribution limit does not coerce a candidate into applying for public funding.[1] Even the plaintiff candidates are divided on whether they will choose public funding.[2]

The final deadline for choosing whether to accept public funding for the upcoming campaign is March 16, 2000. *See* 21–A M.R.S.A. §§ 1125(1), 1122(8), 1125(5) (West Supp.1999). Thus, if this matter is of continuing concern to the Court of Appeals and depending on when it expects to rule, that Court may wish to ask the parties to supplement the record to reveal how many candidates have already chosen public funding and how many candidates have disclosed their intention to stick with private financing. That would reveal in concrete terms whether the private limit is having a coercive effect. I do not construe the scope of the remand-"on the basis of

the record before it," *Daggett v. Commission on Governmental Ethics and Election Practices,* No. 99–2243, slip op. at 2 (1st Cir. Jan. 12, 2000)—to permit me to enlarge the record in this respect.

I trust that this clarification is responsive to the Court of Appeals's remand.[3]

So Ordered.

---

1. In *Vote Choice,* 4 F.3d at 39, the Court said: "The state need not be completely neutral on the matter of public financing of elections. When, as now, the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs facilitate communication by candidates with the electorate, free candidates from the pressures of fundraising, and, relatedly, tend to combat corruption." (Quotation and citations omitted).

2. *Cf.* Daggett Dep., vol. 2, at 124 l. 4—130 l. 11 (stating in July 1999 that she was uncertain whether she would elect the public funding alternative in the 2000 campaign), *with* Fuller Decl. ¶ 6 (declaring in November 1998 that she would not elect the public funding alternative in the 2000 campaign), Cenci Decl. ¶ 7 (declaring in November 1998 that he would not elect the public funding alternative in the 2000 campaign as a matter of princi-

ple), Levasseur Decl. at ¶ 5 (same), Weinstein Decl. ¶ 5 (same).

3. I do note one other ambiguity or conflict in the two judgments I have entered. In the second decision, dealing with the private contribution limits, I declined to rule on the challenge to the gubernatorial limits and dismissed that claim without prejudice. In the first decision, dealing with the public funding provisions, I observed in a footnote that I would not discuss those portions of the statute that deal with the gubernatorial election because the upcoming election does not involve the governorship and none of the plaintiffs purport to be running for governor. That reservation, however, was not reflected in the judgment entered, a general judgment in favor of the defendants. That claim against the public funding provisions so far as they affect the gubernatorial election should analogously have been dismissed without prejudice.