Beverly C. **DAGGETT**, Elaine Fuller, Christopher M. Harte, Mark T. Cenci, Jeffrey I. Weinstein, Shawn Levasseur, and Libertarian Party of Maine, Plaintiffs, Appellants,

Rollin Stearns, National Right to Life Political Action Committee State Fund, and Maine Right to Life Committee Political Action Committee State Candidate Fund, Plaintiffs,

v.

COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, Peter B. Webster, Linda W. Cronkite, Harriet P. Henry, G. Calvin MacKenzie, Merle R. Nelson, in Their Official Capacities as Members of The Commission on Governmental Ethics and Elections Practices of The State of Maine, Secretary of State of Maine, and Attorney General of Maine, Defendants, Appellees.

Beverly C. Daggett, Elaine Fuller, Christopher M. Harte, Mark T. Cenci, Jeffrey I. Weinstein, Shawn Levasseur, and Libertarian Party of Maine, Plaintiffs,

Rollin Stearns, Maine Right to Life Committee Political Action Committee State Fund, and National Right to Life Political Action Committee State Fund, Plaintiffs, Appellants,

v.

Commission on Governmental Ethics and Election Practices, Peter B. Webster, Linda W. Cronkite, Harriet P. Henry, G. Calvin MacKenzie, Merle R. Nelson, in Their Official Capacities as Members of The Commission on Governmental Ethics and Elections Practices of the State of Maine, Secretary of State of Maine, and Attorney General of Maine, Defendants, Appellees.

**446**

Beverly C. Daggett, Elaine Fuller, Christopher M. Harte, Mark T. Cenci, Jeffrey I. Weinstein, Shawn Levasseur, and Libertarian Party of Maine, Plaintiffs, Appellants,

Rollin Stearns, National Right to Life Political Action Committee State Fund, and Maine Right to Life Committee Political Action Committee State Candidate Fund, Plaintiffs,

v.

Commission on Governmental Ethics and Election Practices, Peter B. Webster, Linda W. Cronkite, Harriet P. Henry, G. Calvin MacKenzie, Merle R. Nelson, in Their Official Capacities as Members of The Commission on Governmental Ethics and Elections Practices of the State of Maine, Secretary of State of Maine, and Attorney General of Maine, Defendants, Appellees.

Beverly C. Daggett, Elaine Fuller, Christopher M. Harte, Mark T. Cenci, Jeffrey I. Weinstein, Shawn Levasseur, and Libertarian Party of Maine, Plaintiffs,

Rollin Stearns, Maine Right to Life Committee Political Action Committee State Candidate Fund, and National Right to Life Political Action Committee State Fund, Plaintiffs, Appellants,

v.

Commission on Governmental Ethics and Election Practices, Peter B. Webster, Linda W. Cronkite, Harriet P. Henry, G. Calvin MacKenzie, Merle R. Nelson, in Their Official Capacities as Members of The Commission on Governmental Ethics and Elections Prac-

tices of the State of Maine, Secretary of State of Maine, and Attorney General of Maine, Defendants, Appellees.

Nos. 99–2243, 99–2274, 00–1061 and 00–1066.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 2000.

Order Reheard Feb. 15, 2000.

Decided Feb. 18, 2000.

Opinion Decided March 7, 2000.

Mark Lopez with whom Nat Rosenblatt was on brief for appellant Daggett.

James Bopp, Jr., with whom Eric C. Bohnet, Daniel M. Snow, and James R. Mason, III, were on brief for appellants Stearns, Maine Right to Life Committee Political Action Committee State Candidate Fund, and National Right to Life Political Action Committee State Fund.

Phyllis Gardner and Andrew Hagler, Assistant Attorney Generals, with whom Andrew Ketterer, Attorney General, and Paul Stern, Deputy Attorney General, were on brief for appellees.

Glenn J. Moramarco and John R. Brautigam, with whom Arn Pearson and Gillian E. Metzger, were on brief for amici curiae Betheda Edmonds, Kathleen McGee, Linda McKee, Peggy Pendleton, and Elizabeth Watson.

Brenda Wright and John Bonifaz on brief for amicus curiae Maine People's Alliance.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

## ORDER OF COURT

Mindful of the imminent March 16, 2000, deadline for candidates for the Maine legislature who wish to seek qualification for public campaign funding, having made our best efforts to expedite these consolidated appeals, and having had the benefit of multiple briefings and two sets of oral presentations, we believe, in fairness to the litigants and others similarly situated, that we should announce our ultimate conclusions immediately, a full opinion setting forth our reasoning to follow in the near future.

We therefore announce our determination to affirm the judgments of the district court. We have concluded that the limits on contributions to candidates for Maine's legislature, 21–A M.R.S.A. §§ 1015(1) & (2), 1056(1), are constitutional and that the Maine Clean Election Act, 21–A M.R.S.A. §§ 1121–1128, to the extent challenged in these appeals, also passes constitutional muster. Further, we conclude that the challenge to the limits on contributions to gubernatorial candidates was appropriately dismissed.

To avoid any confusion as to the dates for seeking rehearing or *certiorari*, we announce this determination now but will not enter judgment until the opinion is issued.

*It is so ordered.*

## OPINION

March 7, 2000.

COFFIN, Senior Circuit Judge.

This case involves a challenge to Maine's attempt to reconcile the state's interest in curbing the power of money in politics with the sweeping strictures of the First Amendment. In 1996, Maine voters passed via referendum An Act to Reform Campaign Finance, creating the Maine Clean Election Act, 21–A M.R.S.A. §§ 1121–1128, which introduced a public funding alternative to private fundraising for candidates for elective offices, and lowering the ceiling on campaign contributions, *see id.* §§ 1015(1) & (2), 1056(1).

Plaintiffs-appellants—legislative candidates, campaign contributors, political action committees (PACs), and the Maine Libertarian Party—challenged both the Act, asserting that the public funding mechanism unconstitutionally coerced candidates to participate, and the contribution limits, arguing that they infringed on the First Amendment rights of candidates as well as donors. The district court upheld the constitutionality of the public funding system and the contribution limits. Under the principles set forth by the United States Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam* ), as recently applied in *Nixon v. Shrink Missouri Government PAC,* —— U.S. ——, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), we conclude that the statutes are constitutionally sound. We therefore affirm.

### I. *Factual Background*

Maine voters, pursuant to their authority under Part First, § 1, and Part Third, § 18, of Article IV of the Maine Constitution enacted the Maine Clean Election Act (MCEA) in November 1996 to take effect on January 1, 1999.[1] The Act creates a system of optional public funding for qualifying candidates in state legislative and gubernatorial campaigns, both in primaries and the general election. *See* 21–A M.R.S.A. §§ 1121–1128.[2] It establishes

---

1. Several appellants challenged the Act shortly after the referendum was adopted, but their complaints were dismissed on ripeness and standing grounds. *See Daggett v. Devine,* 973 F.Supp. 203 (D.Me.1997).

2. Maine is apparently the first state in the nation to implement full, as opposed to partial, public funding, meaning that after certification a publicly funded candidate seeks no private contributions. *See* Michael E. Campion, Note, *The Maine Clean Election Act: The Future of Campaign Finance Reform,* 66 Fordham L.Rev. 2391, 2395 (1998); Molly Peterson, Note, *Reexamining Compelling Interests and Radical State Campaign Finance Reforms: So Goes the Nation?,* 25 Hastings Const. L.Q. 421, 425 (1998).

public funding beginning with the 2000 elections, *see id.* § 1123, and requires candidates to complete qualifying actions by March 16, 2000, *see id.* § 1122(8).

In order to qualify for public funding, a candidate must fulfill several requirements during the qualifying period. The candidate must file a declaration of intent that he is seeking certification. *See id.* § 1125(1). The candidate must seek "seed money contributions" in amounts not greater than $100, limited to an aggregate amount that varies depending on the office sought: gubernatorial candidates are limited to $50,000, Senate candidates to $1,500, and House of Representatives candidates to $500. *See id.* §§ 1122(9) & 1125(2). With that seed money, candidates seek out "qualifying contributions," $5 donations in the form of a check or money order payable to the Maine Clean Election Fund ("Fund") in support of their candidacy from registered voters in their district. *See id.* §§ 1122(7) & 1125(3). Again, the requisite number of qualifying contributions depends on the type of seat sought: gubernatorial candidates must collect 2,500 contributions, Senate candidates 150 contributions, and House candidates 50 contributions. *See id.* § 1125(3).

Once certified as a "participating candidate" by the Maine Commission on Governmental Ethics and Election Practices, a candidate must agree not to accept any private contributions and not to make expenditures except from disbursements made to him from the Fund. *See id.* § 1125(6). The candidate transfers all unspent seed money to the Fund and receives an initial disbursement from the Fund. *See id.* § 1125(5) & (7).

The amount of the initial distribution is the average amount of campaign expenditures in the prior two election cycles for the particular office, although for the 2000 elections that amount has been discounted by 25% in order to ensure the availability of adequate funds. *See id.* § 1125(8); State of Maine Commission on Governmental Ethics and Election Practices, *A Candidate's Guide to the Maine Clean Election Act* (1999) [hereinafter *Candidate's Guide* ].[3] For the 2000 elections, participating Senate candidates will receive an initial distribution of $4,334 for the primary ($1,785 if uncontested) and $12,910 for the general election; House candidates will receive $1,141 for the primary ($511 if uncontested) and $3,252 for the general election. *See Candidate's Guide* (Table: Maine Clean Election Fund Distributions for State Senators and Representatives).[4] Participating candidates face both civil and criminal penalties for violation of the participation rules. *See* 21–A M.R.S.A. § 1127.

In addition to the initial disbursement, a participating candidate receives a dollar-for-dollar match of any monies raised by a non-participating opponent after the opponent raises more than the initial disbursement allotted to the participating candidate. *See id.* § 1125(9). Matching funds are also provided to correspond to "independent expenditures," outlays made by an independent entity endorsing the participant's defeat or the non-participating opponent's election. *See id.* Once the participating candidate has received double the initial distribution in matching funds, however, the matching funds cease. *See id.* No matter how much additional fundraising the participant's non-participating opponent undertakes, the participant's matching funding is capped at two times the initial distribution.

---

**3.** The distribution amounts will be recalculated by the Commission at least every four years. *See* 21–A M.R.S.A. § 1125(8).

**4.** We realize that the district court's recitation of distribution amounts stated that Senate candidates would receive $2,100, as opposed to $1,785, for an uncontested primary. The district court's numbers were derived from a deposition. We utilize the *Candidate's Guide* references because they are both more recent and more reliable. Because there is no gubernatorial election in Maine in 2000, the funding amounts for future gubernatorial candidates remain in draft format. For uncontested general elections, no funds will be distributed. *See* 21–A M.R.S.A. § 1125(8)(D).

Reduced limits on contributions by individuals and groups to political candidates were enacted simultaneously with the Act by the voter referendum and effectively apply only to non-participating candidates. The limit on contributions made by an individual to a candidate in an election was reduced to $500 for gubernatorial candidates and $250 for all other candidates, *see id.* § 1015(1); the limit on contributions to a candidate by a political committee, other committee, corporation, or association in a single election was reduced to $500 for gubernatorial candidates and $250 for all other candidates, *see id.* §§ 1015(2) & 1056(1). In addition, a pre-existing disclosure statute requiring reporting of independent expenditures aggregating more than $50 in any election was adapted to conform to the Act. *See id.* § 1019.

The Daggett appellants are candidates who sought legislative office in 1998 and plan to seek office again in 2000, the Libertarian Party of Maine, and an individual campaign contributor. Their major complaint about the public funding system is that as a whole it is coercive in its efforts to encourage candidates to become publicly funded and therefore unconstitutionally burdens the First Amendment rights of candidates. The Stearns appellants are an individual and two political action committees, the Maine Right to Life Committee Political Action Committee State Candidate Fund and the National Right to Life Political Action Committee State Fund, which have made contributions to and expenditures on behalf of political candidates. They challenge in particular the constitutionality of providing matching funds for independent expenditures, arguing that it violates their political speech

and associational rights. Both sets of appellants contest the constitutionality of the reduced contribution limits. The defendants are the Maine Commission on Governmental Ethics and Election Practices, responsible for implementing the statutes, Maine's Attorney General, and its Secretary of State.[5]

The district court held that the Clean Election Act viewed in its entirety was not sufficiently coercive as to make participation involuntary and that the matching funds provision, in particular, withstood appellants' challenge. *See Daggett v. Webster,* 74 F.Supp.2d 53, 55 (D.Me.1999). The court retained the issue of whether the contribution limits were *per se* constitutional and entered partial final judgment on the remainder of appellants' claims pursuant to Fed.R.Civ.P. 54(b). Briefs were filed and oral arguments heard on the interlocutory appeal of this order. The district court subsequently upheld the independent constitutionality of the contribution limits for House and Senate candidates and dismissed the challenge to the limits on contributions by political parties due to lack of standing and the limits for gubernatorial candidates due to lack of both ripeness and standing. *See Daggett v. Webster,* 81 F.Supp.2d 128 (D.Me.2000). Appellants appealed that decision as well.

We allowed appellants' motions to consolidate the appeals, expedited the briefing schedule, and shortly after oral argument issued an order announcing our conclusions in order to allow the parties and others to proceed in the face of imminent statutory deadlines. We now explain those conclusions and address all aspects of the consolidated appeals.[6] First we ad-

---

**5.** We recognize the contributions of amici to the case before us. The considerable input of both sets of amici, a group of individuals who plan to seek election in 2000 as publicly funded candidates and the Maine People's Alliance, was of great assistance to the district court as well as this court in our contemplation of the important issues presented.

**6.** Prior to consolidation, we asked the district court, via an order for clarification on a limit-

ed remand, to address particularly whether the reduced contribution limits, in conjunction with the other aspects of the system, created coercion. We also allowed the parties additional briefing on this issue. As a result of our decision to allow consolidation, we here address two sets of briefs, an additional group of limited briefs, and two sessions of oral arguments.

dress the independent challenges to the contribution ceilings and the matching funds provision, as it relates to the independent expenditures of non-candidates, and then we consider the contention that the public funding system, as a whole, is unconstitutionally coercive.

## II. *Contribution Limits*

Both sets of appellants challenge the *per se* constitutionality of the limits on contributions. They allege that the limits violate their First Amendment free speech and associational rights.

The district court, without the benefit of the recently decided Supreme Court decision in *Shrink Missouri PAC*, held that the contribution limits are not unconstitutional because they do not burden the First Amendment rights of candidates or donors. The court invoked the principles set forth in the Supreme Court's landmark political speech case of *Buckley*, in which the Court upheld a $1,000 limit on contributions by individuals or groups to federal office candidates and a $5,000 limit on donations from "political committees." In *Shrink Missouri PAC*, the Court reaffirmed the principles enunciated in *Buckley* and applied them to validate a $1,075 limit on contributions to certain candidates for offices in Missouri. *See Shrink Missouri PAC*, 120 S.Ct. at 903–10.

■ Political speech, including commentary on the qualifications of a political candidate, has long been recognized as "integral to the operation of the system of government established by our Constitution." *Buckley*, 424 U.S. at 14, 96 S.Ct. 612. Speech has historically been protected "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (restating the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). The protection af-

forded by the First Amendment is incorporated into the Fourteenth Amendment and thus it applies to this action by a state. *See New York Times*, 376 U.S. at 276–77, 84 S.Ct. 710.

An indirect restriction on political speech, in the form of a limitation on contributions to candidates, was evaluated and upheld by the Court in *Buckley*. The Court identified three areas of potential First Amendment implication: the contributor's free speech, the candidate's free speech, and the freedom of association. First, regarding a contributor's right to free speech, the Court discounted the effect of contribution ceilings:

[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Buckley,* 424 U.S. at 20–21, 96 S.Ct. 612 (footnote omitted).

Second, with respect to candidates' free speech rights, the Court indicated that contribution limits are constitutional if they do not prevent candidates from "amassing the resources necessary for effective advocacy." *See id.* at 21, 96 S.Ct. 612. The Court concluded that there was "no indication ... that the contribution limitations imposed by the [Federal Clean Election] Act would have any dramatic adverse effect on the funding of campaigns and political associations." *Id.* In *Shrink Missouri PAC,* the Court explained that in *Buckley,* "We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Shrink Missouri PAC,* 120 S.Ct. at 909.

Third, the Court identified the major constitutional issue invoked by contribution limits: "[T]he primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association." *Buckley,* 424 U.S. at 24–25, 96 S.Ct. 612. The Court pronounced that "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate." *Id.* at 22, 96 S.Ct. 612. Freedom of political association is a "'basic constitutional freedom,'" restrictions on which are subject to the "'closest scrutiny.'" *See id.* at 25, 96 S.Ct. 612 (citations omitted). Yet the right is not absolute and even a "significant interference" may be sustained if the state demonstrates a "sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associa-

tional freedoms." *Id.* (internal quotations and citations omitted).

The Court in *Shrink Missouri PAC,* while applying the principles of *Buckley,* supplied a clarification of approach that represents a checkering on the enhancement of the state's burden implicit in some lower court cases subsequent to *Buckley. See Shrink Missouri PAC,* 120 S.Ct. at 909. Acknowledging that "[p]recision about the relative rigor of the standard to review contribution limits was not a pretense of the *Buckley* per curiam opinion," the Court referred to the general reliance on "'exacting scrutiny'" and elaborated: "under *Buckley*'s standard of scrutiny, a contribution limit involving 'significant interference' with associational rights ... could survive if the Government demonstrated that the contribution regulation was 'closely drawn' to match a 'sufficiently important interest,' ... though the dollar amount of the limit need not be 'fine tun[ed].'" *Id.* at 903–04 (quoting *Buckley,* 424 U.S. at 25, 30, 96 S.Ct. 612).[7]

It then invoked *Buckley*'s identification of the actuality and appearance of corruption as the justification of contribution limits, *see Buckley,* 424 U.S. at 26–27, 96 S.Ct. 612, adding: "In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Shrink Missouri PAC,* 120 S.Ct. at 905.

The Court in *Shrink Missouri PAC* also spoke to several related issues. It observed that although the quantum of evidence of corruption or its appearance in

7. The Court addressed only the government's corruption interest when reviewing the contribution limits. Nevertheless, in its discussion of candidate expenditure limitations, it rejected as insufficient government interests in equalizing the relative voice of citizens, *see Buckley,* 424 U.S. at 48–49, 96 S.Ct. 612 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."), and suppressing the cost of campaigns, *see id.* at 57, 96 S.Ct. 612 ("[T]he mere growth in the cost of federal election campaigns in and of itself provides no basis for governmental restrictions on the quantity of campaign spending and the resulting limitation on the scope of federal campaigns.").

*Buckley* "exemplifies a sufficient justification for contribution limits, it does not speak to what may be necessary as a minimum." *Id.* at 906. It also made clear that an argument based on adjusting the *Buckley*-approved $1,000 ceiling for subsequent loss of purchasing power to establish the maximum limit was the product of misunderstanding. *See id.* at 909. And it was unmoved by the argument that contribution limits necessarily favor incumbents over challengers. *See id.* at 905 n. 4. Finally, the Court was apparently unimpressed that following the imposition· of the contribution limits, total spending for five statewide offices affected by the $1,075 contribution limit declined by more than half, a fact pointed out in Justice Thomas's dissent. *See id.* at 925 n. 10 (Thomas, J., dissenting). In *Buckley*, the Court was faced with the more benign statistic, agreed to by the parties, that only about 5% of the funding raised by all federal congressional candidates in the prior election would not have been allowed by the limits. *See Buckley*, 424 U.S. at 21 n. 23, 96 S.Ct. 612.[8]

Given this framework of principles, we first consider whether there is sufficient evidentiary support of the threat of corruption or its appearance to warrant the potential infringement on the freedom of association by the contribution ceilings, because if this infringement is constitutional, any limits on free speech rights would necessarily pass muster. Following that,

we will consider whether the limits prevent candidates from amassing the necessary resources, thus eclipsing their free speech rights.

■ Generally, factual findings of the district court are reviewed only for clear error. *See* Fed.R.Civ.P. 52(a). An appellate court's review of a First Amendment claim sometimes, however, "carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 567, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). In a case like this, " 'a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts.' " *Id.* (quoting *Fiske v. Kansas*, 274 U.S. 380, 385–86, 47 S.Ct. 655, 71 L.Ed. 1108 (1927)). Our decision must be based largely on legislative, as opposed to adjudicative, facts. *See Daggett*, 81 F.Supp.2d at 128–30; *Daggett v. Commission on Governmental Ethics and Election Practices*, 172 F.3d 104, 112 (1st Cir.1999) ("[S]o-called 'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no

---

**8.** We, like the district court, have confined ourselves to *Buckley* and *Shrink Missouri PAC* principles rather than lower court cases on contribution limits. What was prophesy on the part of the district court has been confirmed by the teachings of *Shrink Missouri PAC*, which renders much of the post-*Buckley* case law of little value to us. Of the cases cited to us by appellants and decided by circuit courts of appeal, we have the following comments. *Service Employees International Union v. Fair Political Practices Commission*, 955 F.2d 1312 (9th Cir.1992), did not involve an assault on limits *per se;* the court held, rather, that the imposition of limits based on annual contributions impermissibly favored incumbents. *See id.* at 1321. In *California Prolife Council Political Action Committee v.*

*Scully*, 164 F.3d 1189 (9th Cir.1999), the court merely affirmed a grant of a preliminary injunction without addressing the merits of any contribution limits. *See id.* at 1190 (explaining that "on this appeal, we do not consider whether the court applied the law properly" and ordering the district court to proceed to the merits of the case expeditiously). In both *Carver v. Nixon*, 72 F.3d 633 (8th Cir.1995), and *Russell v. Burris*, 146 F.3d 563 (8th Cir.1998), the Eighth Circuit engaged in reasoning disavowed by *Shrink Missouri PAC*, evaluating the limits in comparison to an inflation-adjusted $1,000 limit upheld in *Buckley. See Carver*, 72 F.3d at 641; *Russell*, 146 F.3d at 570. Moreover, in *Russell*, the court required evidence of actual corruption. *See Russell*, 146 F.3d at 569.

application to legislative facts." (citing Fed. R.Evid. 201 advisory committee's note)).[9]

## A. Evidence of Corruption and its Appearance

We now inquire whether, under the guidelines of *Shrink Missouri PAC,* the evidentiary showing of corruption or its appearance is sufficient to establish Maine's interest. There, the Court found that the evidence in support of Missouri's statute was more than sufficient to sustain the state's evidentiary obligation. *See Shrink Missouri PAC,* 120 S.Ct. at 907–08 ("[T]his case does not present a close call requiring further definition of whatever the State's evidentiary obligation may be:... There might, of course, be need for a more extensive evidentiary documentation if petitioners had made any showing of their own to cast doubt on the apparent implications of *Buckley*'s evidence and the record here."); *see also Buckley,* 424 U.S. at 27, 96 S.Ct. 612 (because corruption can "never be reliably ascertained," all that is required is that the threat not be "illusory"). Although the evidence did not show that the Missouri legislature relied on the findings accepted in *Buckley,* a state senator, the co-chair of the legislature's Interim Joint Committee on Campaign Finance Reform, stated that large contributions had the "'real potential to buy votes.'" *See Shrink Missouri PAC,* 120 S.Ct. at 907. There were also several newspaper accounts recounting large contributions that supported inferences of impropriety. *See id.* Finally, the evidence established that "'74 percent of [those who voted on a referendum to impose contribution limits in] Missouri determined that contribution limits are necessary to combat corruption and the appearance thereof.'" *Id.* at 908 (citation omitted).

In this case, the State contends that Maine voters as well as legislators and those intimately involved in the political process have valid concerns about corruption and the appearance thereof caused by large contributions. Under the prior contribution limits of $1,000 per election for an individual and $5,000 for a PAC, a single political action committee could fund the average 1998 House campaign twice over and could provide over half of the average 1998 Senate campaign by making the maximum primary and general election donations. An individual, again making the maximum contributions, could provide nearly one-half of the average House race funding and over one-tenth of the average Senate campaign funding.

Further, the opportunity to make such large contributions translated into a perception among Maine voters that corruption was a reality in the State House. Statements similar to the one relied upon in *Shrink Missouri PAC* were offered here. One representative attested to the belief of many of his constituents that legislators are "beholden" to large contributors: Representative David Shiah, currently the House Assistant Majority Leader, attested that, "Based upon extensive conversations with voters in my district, it is my opinion that voters believe that there is too much money in politics today and that most politicians are beholden, or give special access, to those who give large amounts to their campaigns." Senator Chellie Pingree related instances in which she and other legislators were pressured to change their position on an issue or risk the loss of contributors' support. On one occasion, for example, she was admonished by lobbyists for a certain interest that if she continued to sponsor a bill in opposition to that interest, Democratic legislators would lose significant campaign contributions; after Pingree and Democratic leaders forged ahead with the legislation, the special interests did not, in fact, donate to Democratic leadership PACs the following year, despite their history of doing so.

---

**9.** The Rules of Evidence state that the court may take judicial notice of legislative facts whether requested or not. *See* Fed.R.Evid. 201(c). A "legislative fact" is defined as "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

An abundant file of press clippings includes both news stories and editorial comment covering the years 1995–1999. The following sampling suggests that large contributions have occurred in Maine and that Maine citizens are concerned about their impact on lawmakers. Indeed, the evidence to this effect is far greater than that cited in *Shrink Missouri PAC.*

One story states that "[r]anking lawmakers and their committees pulled in close to $400,000 in big gifts from special interests, almost all of which lobby the Legislature." Paul Carrier, *Contributions Give Special Interests Political 'Box Seats,'* Maine Sunday Telegram, Jan. 3, 1999, at 1A. One column declared, "There is nothing illegal about tobacco companies bankrolling political campaigns—only suspicious. We can debate the influence of campaign contributions till the cows come home, but one fact remains: The money is given on the expectation that it will influence policy." Editorial, *Taking the Money,* Maine Times, May 15, 1997. This sentiment has been oft-repeated: "A group with a certain point of view can buy influence during a political campaign with a campaign donation. Politicians routinely deny that influence is being bought; evidence is often to the contrary." Editorial, *A Stain–Guard for State Government,* Lewiston Sun–J., May 7, 1997. Not only are Maine's citizens concerned, but so are its political leaders; Governor Angus King, who self-imposed a contribution limit of $250 in his 1998 reelection campaign, stated on a national news program that "the problem is we've got this situation where you either have to have your own money or you have to be beholden." *Newshour with Jim Lehrer* (National Public Radio broadcast, Mar. 26, 1997).

The fundraising practices of Maine legislators have drawn much criticism. One article reported negatively on a fundraising breakfast that an organization hosted for legislators who served on a committee handling bills affecting the organization, emphasizing the absence of average citizens. *See* Bill Nemitz, *Dough Rises for Political Pancakes,* Portland Press Herald, Mar. 8, 1996, at 1B. Another questioned the propriety of an industry hosting a fundraiser for a legislator the day before a hearing on an important bill affecting the industry. *See* Editorial, *Gravel Industry Didn't Expect Anything for Lord Fund–Raiser?,* Portland Press Herald, Mar. 26, 1996, at 6A. An editorial criticizing such fundraisers commented, "The whiff of too-close connections between influential lawmakers and interests with big money on the line added an acrid aroma to legislating in both the House and the Senate this session." Nancy Grape, *Let's Change the Pockets Instead of Pocketing the Change,* Portland Press Herald, Apr. 7, 1996, at 5C.[10]

In addition, a survey of Maine residents showed that over 70% of respondents believed that large campaign contributions were a major source of political corruption, that large donors received special treatment from legislators, that the new contribution limits would renew currently lagging faith in the integrity of the process among the electorate, and that the new limits would help decrease the potential for undue influence.[11]

---

**10.** *See also* Liz Chapman, *Blue Cross Debate Potential Powder Keg,* Lewiston Sun–J., Mar. 2, 1996, at 1A (Blue Cross insurance company held fundraising breakfast for committee co-chair two days after hearing on conversion of Blue Cross to for-profit company); Evan Halper, *Money May Not Buy Access, But MBNA Sure is Trying Hard,* Maine Times, Oct. 26, 1995 (contributions of a large credit card company, MBNA, to top federal and state officials); Editorial, *Follow the Bouncing Dollars,* Capital Weekly, Sept. 30, 1995 (receipt of checks by large group of legislators from Monsanto chemical company in same year that Maine Legislature voted to lift ban against one of its products).

**11.** *See* Lake Sosin Snell Perry & Associates, Inc., *Public Attitudes on Campaign Financing in Maine: Findings from a Survey of Maine Citizens* 3–5 (June 1997). Appellants highlight the fact that three-quarters of respondents did not believe that a $250 donation was "large." *See id.* at 5. Respondents also agreed, however, at a rate of 83%, that limits on contributions to legislative candidates

Finally, we take note, as did the Court in *Shrink Missouri PAC*, of the fact that Maine voters approved the referendum imposing reduced contribution limits as indicative of their perception of corruption. The body of evidence here clearly surpasses the quantum of evidence offered and accepted as sufficient in *Shrink Missouri PAC* and would meet an even higher standard if one were applicable.

Moreover, the limits are sufficiently closely drawn by the standards set forth in *Buckley*, as applied in *Shrink Missouri PAC*. In *Buckley*, the Court concluded that the $1,000 limit on contributions to federal office seekers was closely drawn because it focused on "the narrow aspect of political association where the actuality and potential for corruption have been identified— while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley*, 424 U.S. at 28, 96 S.Ct. 612. The statute here also leaves these avenues open and confronts only those making the largest donations, touching only 3.7% of donors to House campaigns and 7.1% of donors to Senate campaigns in 1998.[12]

Appellants assert that the statute is overbroad, reminiscent of the challengers' contentions in *Buckley*. They allege that the State's only compelling interest is in preventing corruption arising from *large* contributions and that $250 and $500 contributions are not sizeable enough to allow

the fruition or create the appearance of corruption.

The Court in *Buckley* concluded that the statute was not overbroad because it was important for the government to safeguard against even the appearance of potential corruption; the Court's role was not to determine whether a higher limit would have been as effective, and a contribution limit was not invalid merely because of a legislative "failure to engage in ... fine tuning." *See id.* at 30, 96 S.Ct. 612. The Court in *Shrink Missouri PAC* added that "the public interest in countering [the perception of corruption] was, indeed, the entire answer to the overbreadth claim raised in the *Buckley* case." *Shrink Missouri PAC*, 120 S.Ct. at 906. Cases referenced by *Shrink Missouri PAC* display the reluctance of the Court to second-guess legislative determinations, especially when corruption is the harm to be prevented. *See, e.g., Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 500, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (recognizing the "proper deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized"); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.").

■ Further, we cannot determine whether the limits would better serve their purpose if set at some other monetary

---

should be $250 or higher. *See* Lake Sosin Snell Perry & Associates, Inc., *Campaign Finance Issues: Banners from a Survey of 400 Residents of the State of Maine* 7 (June 19–22, 1997). Our review does not require us to define "large" but rather to determine whether the contribution ceilings prevent candidates from "amassing the resources necessary for effective advocacy." *See infra* Section II.B. In making this determination, we remind ourselves of Justice Breyer's admonition that courts are not the "absolute arbiter of a difficult question best left, in the main, to the

political branches." *Shrink Missouri PAC*, 120 S.Ct. at 911 (Breyer, J., concurring).

**12.** These statistics appear in the district court opinion, *see Daggett*, 81 F.Supp.2d at 130–31, and are derived from the report of the State's expert, Anthony Corrado, Associate Professor of Government at Colby College in Waterville, Maine. Corrado, in turn, computed these statistics from information contained in election reports collected by the Commission, as complied and categorized by the Edmonds amici.

level; " '[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.' " *Buckley,* 424 U.S. at 30, 96 S.Ct. 612 (quoting court of appeals opinion, *Buckley v. Valeo,* 519 F.2d 821, 842 (D.C.Cir.1975)). "Such distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.* In *Shrink Missouri PAC,* the Court rejected a claim that the limitations at issue were "different in kind" from those allowed in *Buckley. See Shrink Missouri PAC,* 120 S.Ct. at 909.

The Court in *Shrink Missouri PAC* validated the constitutionality of a $1,075 limit for state-wide offices and any office representing more than 250,000 constituents, *see id.* 120 S.Ct. at 903–10; in Maine, there are 35 Senate districts comprised of approximately 34,000 constituents and 151 House districts comprised of roughly 8,000 constituents. Moreover, campaigns are inexpensive compared to most other states.[13] As the district court stated, "If contribution limits are permissible, differences in their level from state to state should reflect democratic choices, not court decisions." *Daggett,* 81 F.Supp.2d at 139 (footnote omitted).

■ We cannot say that the limits here are different in kind from those upheld in *Buckley* and *Shrink Missouri PAC.* Thus, we conclude that Maine's contribution limits of $250 do not unconstitutionally infringe upon candidates' and donors' free association rights because they are supported by a sufficiently important governmental interest to which the ceilings are closely tailored. Now we turn to consider the final question regarding contribution limits, whether they disallow candidates from gathering enough financial support to efficiently advocate their views.

### B. *Ability of Candidates to Amass Sufficient Resources*

Here we confront an extraordinary statistical battle between the parties. Both sides rely on data collected by the Commission through election reports as well as a database, compiled by the Edmonds amici, categorizing and summarizing the Commission data.

Appellants strongly urge that the contribution limits will cripple the campaigns of legislative candidates, assailing us with distressing statistics and dire predictions from their experts. The Daggett appellants marshal the statistics to support their argument that donations to legislative candidates would be greatly decreased and to emphasize particular categories of "losers," who they identify as challengers, those seeking traditionally expensive seats, and candidates unenrolled in one of the two parties recognized in Maine, who cannot collect contributions for a primary election. They argue that if even one candidate's ability to amass sufficient resources is affected, the limits are unconstitutional.

The statistics they provide are wide-ranging, and depict, for example, that in 1998 contributions to all House candidates would have declined by 16% and all Senate candidates by 33%;[14] donations to Senate incumbents would have declined by 25.7%

---

**13.** The State cites an article in which fourteen states, selected to represent a full range of possibilities, were surveyed and the average cost of a competitive House race in 1994 ranged from a high of $430,994 in California to a low of $4,449 in Maine.

**14.** Certified public accountant Dennis Mowry computed these statistics at the request of the Daggett appellants from data collected by the Commission, specifically data in all election reports except for six-day preliminary reports, counting each contribution over $250 as if it were only $250. Among the other statistics offered by appellants, derived from the Corrado report, is one for "competitive" races, defined as races in which the winner received more than 40% but less than 60% of the vote. In 1998 competitive Senate races, receipts for incumbents would have declined by 30% and for challengers by 44%. Further, appellants suggest that in open-seat races receipts of winning candidates would have declined by 47.2% while those of losing candidates would have decreased by 55.5%.

and to Senate challengers would have decreased by 39%.[15] The Stearns appellants make similar baleful forecasts, calculating that 39% of the total funds contributed to Senate candidates and 21% of funds contributed to House candidates in 1998 would have been lost.[16] They also highlight the worst-hit challengers, one of whom would have lost almost 73% of her funding.[17]

The State responds with its own statistics and the conclusion of its expert that the contribution ceilings will not have a significant effect on campaign fundraising. The State's expert, Professor Anthony Corrado, concluded that the average 1998 House candidate would have experienced a spending reduction of 14.7%, or $778, and the average Senate candidate 29.0%, or $5,694.[18] Corrado concluded that in 1998, almost half of House candidates would have experienced no loss at all and nearly two-thirds would have lost less than 10%, or $318; approximately one-quarter of Senate candidates would have suffered no loss and almost one-half would have lost less than 10% of their funds, or $495.

The district court eschewed reliance on any of the statistics proffered by the parties and instead relied on the only concrete facts regarding the impact of the limits—information provided by the one election conducted since the limits took effect, a 1999 special election for the City of Lewiston's seat in the House. In that seven-week campaign, one candidate raised $10,892 and her opponent, without party support, raised $5,409; both were well above the 1998 expenditure average.

Although it was somewhat unique because by definition it was the only race occurring at that time and thus the candidates were not in competition for donors' dollars with candidates in other races, we agree that the Lewiston special election provides useful information. The only other concrete information available to us is that Governor Angus King succeeded in his reelection bid in 1998 under a self-imposed contribution limit of $250.[19] These two pieces of information, in conjunction with other factors we have considered, suggest to us that the effects on campaign funding are not so significant as appellants predict.

The official records of the Commission state that in 1998 the average Senate candidate incurred expenses of $18,445 and the average House candidate $4,725. Beyond that, as evinced by the parties' calculations, there are a variety of approaches to analyzing the statistics in order to exaggerate or downplay the results. At present, only "worst-case" scenario statistics, which consider the historical funding pattern and discount any contribution made over the limit, are available. These statistics, however, do not account for adaptations in human behavior and the likelihood that patterns will change to recoup whatever may be lost. Thus, the only picture that we can create by utilizing past statistics is one which likely overpredicts the resultant loss of contributions. Indeed, with such a bellwether, the flock would never go anywhere.

For example, a donor who wishes to give $500 to a legislative candidate may choose

---

**15.** These statistics were derived from the amici database and computed by factoring out a candidate's own contributions to his campaign and the first $250 of any contributions over $250.

**16.** The Stearns appellants explained that these statistics were computed by dividing the fall-off in receipts, as recorded in the amici database, by total expenditures, as computed by the State's expert. We note that these figures emphasize the decrease by using total expenditures, as opposed to the often higher number of total contributions, as the denominator.

**17.** These numbers were culled directly from the amici database.

**18.** Corrado compiled his figures from data in the amici database, adjusting for personal contributions, unitemized contributions, and any surplus in a candidate's campaign funds.

**19.** Alan Caron, a communications and political consultant, attested that Governor King raised $450,000 under the self-imposed limit.

to make a $250 donation to the primary campaign and another $250 donation for the general election, fully in compliance with the limits. Because some candidates will opt for public funding, there will be fewer candidates competing for donors' dollars. Furthermore, candidates will seek out additional supporters if necessary, as contemplated in *Buckley:*

> The overall effect of the [contribution limits] is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression.

*Buckley,* 424 U.S. at 21–22, 96 S.Ct. 612; *see id.* at 26 n. 27, 96 S.Ct. 612 ("Presumably, some or all of the contributions in excess of $1,000 could have been replaced through efforts to raise additional contributions from persons giving less than $1,000."). Candidates may, as some have predicted, resort to additional kinds of low-level fundraising events.

Moreover, there exists, as appellants' expert acknowledged, the obvious opportunity for more members of a family, or officers and employees of a company, to make individual contributions. And there is the open-ended possibility for new PACs to form in support of a candidate, a group of candidates, or a legislative objective.

With regard to particularly affected groups, we reiterate that our role is not to probe the intricacies of the limit. *See id.* at 30, 96 S.Ct. 612. Even if we were to consider the effects on individual groups, we would not find enough to deem the limits facially unconstitutional.

For example, incumbents are inherently benefitted by our political establishment and the limits do not make that advantage significantly more powerful. *See, e.g., Shrink Missouri PAC,* 120 S.Ct. at 905 n. 4 (stating that in *Buckley,* "We found no support for the proposition that an incumbent's advantages were leveraged into something significantly more powerful by contribution limitations applicable to all candidates, whether veterans or upstarts").[20] Further, the argument that candidates unenrolled in parties are unfairly prejudiced was rejected as a basis for overturning contribution limits in *Buckley. See Buckley,* 424 U.S. at 31, 33–34, 96 S.Ct. 612 (elaborating that "the record provides no basis for concluding that the [Federal Election Campaign] Act invidiously disadvantages such candidates" because "the Act on its face treats all candidates equally with regard to contribution limitations"). Finally, we cannot accept appellants' argument that if even one candidate is affected the limit is unconstitutional; "a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under *Buckley.*" *Shrink Missouri PAC,* 120 S.Ct. at 909.

In sum, under Maine's contribution limits, any person who wishes to contribute to a candidate or engage in independent speech may do so; candidates are free to solicit from any individual they wish; 96.3% of House candidate donors and 92.9% of Senate candidate donors can continue to contribute at the level they did in the last election,[21] and the average House candidate would lose only approximately $778 and Senate candidate $5,694. We cannot say, in the language of *Shrink Missouri PAC,* that the limits on contributions to Maine's legislative candidates are

---

**20.** We observe that the State's expert predicts that all categories of candidates will be "fairly evenly" affected, citing statistics, for example, that in the 1998 House elections, 78.4% of challengers and 82.9% of incumbents would have experienced a spending reduction of 20% or less.

**21.** In *Shrink Missouri PAC,* the Court noted that the donations of 97.62% of contributors in the election prior to the implementation of the limits to the office sought by the plaintiff were under $2,000. *See Shrink Missouri PAC,* 120 S.Ct. at 909.

"so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Id.*

We add one observation to what has been an effort to assess the likely impact of contribution limits under ever-changing conditions by a branch of government singularly removed from the realities of political processes. It is the statistics distilled from experience that, far more than worst-case scenarios, should inform decisions as to proper contribution limits.

We note that our discussion applies to the limits on contributions from individuals, *see* 21–A M.R.S.A. § 1015(1), as well as those from groups and associations, *see id.* §§ 1015(2), 1056(1). As the Supreme Court explained in *Buckley,* limitations on contributions from groups are a necessary adjunct if limits on individual contributions are to be effective. *See Buckley,* 424 U.S. at 35–36, 96 S.Ct. 612.

Although the district court dismissed, due to lack of standing, the challenge on contributions from political parties, we see no reason to parse political parties from the more general "association" and "committee" referenced by the statute. *See* 21–A M.R.S.A. § 1052(2) & (5). In Maine, a political party's fundraising committee must register as a political committee the same way that a political action committee does.[22] Here we have appellants who clearly have standing to challenge the group contribution limitation and our holding as to their claims necessarily applies to all groups. That is not to say, however, that political parties might not later mount a challenge to the limits once the effect of their application to parties becomes clear. *See, e.g., Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 91–98, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (considering effect of state campaign expense reporting requirements on minor parties).

### C. *Contributions Limits for Gubernatorial Candidates*

The district court also dismissed without prejudice appellants' challenge to the limits on contributions to gubernatorial candidates on the ground that none of the parties had standing to challenge this particular limit. In order to have standing, a party must exhibit an actual or threatened injury that is traceable to the defendant's action and that will be redressed by a favorable decision. *See Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 36 (1st Cir.1993) (citing *Riverside v. McLaughlin,* 500 U.S. 44, 51, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991)). None of the appellant candidates claims to be a candidate for governor in 2002, and none of the appellant donors claim that they would give more than $500 to an identifiable gubernatorial candidate but for the contribution limits. The Daggett appellants hold out Christopher Harte, a long-time donor to various campaigns, as someone with a sufficiently real or threatened injury to challenge the limits, alleging that he also has "listener standing," because he is an interested individual who will hear less campaign speech under the new limits.

The concept of "listener standing," as briefly sketched by appellants, does not find support in the jurisprudence of this court, which has emphasized the importance of a real or threatened injury. *See, e.g., Adams v. Watson,* 10 F.3d 915, 919 (1st Cir.1993) ("The injury-in-fact inquiry 'serves to distinguish a person with a *direct stake* in the outcome of a litigation— *even though small*—from a person with a mere interest in the problem.'" (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973))). Even if the Supreme Court cases relied on by appellants, principally *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425

---

**22.** 21–A M.R.S.A. § 1052(5)(A)(1) defines "political action committee" as including, among other things, "[a]ny separate or segregated fund established by any corporation, member- ship organization, cooperative or labor organization whose purpose is to influence the outcome of an election, including a candidate or question."

U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), stood for the proposition that a mere listener to campaign speech has standing to assert a challenge to a statute that he alleges will diminish such speech, which we doubt, in the case before us, there is no specific speech that appellants can point to that is being compromised. *See id.* at 756, 96 S.Ct. 1817 (remarking that in that case a definite speaker existed who attested that but for the statute at issue he would advertise certain information).

 Further, although the Stearns appellants have made gubernatorial contributions over $500 in the past, that is not sufficient. *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." (quoting *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923))). Finally, none of appellants' affidavits provide enough specificity about future plans for contributions to display a real or even a threatened injury.[23] *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (injury may not be "conjectural" or "hypothetical" (internal quotations and citations omitted)). Therefore, we affirm the district court's dismissal without prejudice of the challenge to the gubernatorial campaign limits.

The district court also indicated that the issue was not ripe because the next elec-

tion for governor in Maine will not occur until 2002.[24] Ripeness is an issue that often overlaps with standing; "[j]usticiability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *see also Rhode Island Ass'n of Realtors v. Whitehouse,* 199 F.3d 26, 33 (1st Cir.1999) ("[S]tanding and ripeness may substantially overlap."). Whether or not the issue is technically ripe, the clock is certainly ticking. Although apparently no one has officially declared candidacy for the governorship yet, potential candidates may very well be testing the waters and could begin seeking contributions at any time. We hope that the current situation, in which unforeseeable delay has caused both the parties and the court to face imminent statutory deadlines, will be avoided in the next phase of litigation, if there is one.

### III. The Maine Clean Election Act: Matching Funds for Independent Expenditures

#### A. Matching Funds

 The Stearns appellants challenge the *per se* constitutionality of that part of the matching funds provision, also known as a "trigger," that grants funds to participating candidates based on independent expenditures made either against their candidacy or on behalf of their non-participating opponent. Appellants contend that this practice violates the First Amendment

---

**23.** Harte's declaration states:

I have contributed to both federal and state candidates in the past in amounts up to the applicable limits. In 1998, I contributed $2,000 to Congressman Tom Allen, $1,000 to a U.S. Senate candidate from Colorado, $500 to Maine State Senator Beverly Daggett, and took out a radio advertisement urging the re-election of Governor King. In 1994, I also contributed $1,000 to Governor King. I anticipate supporting candidates in the future with financial assistance.

The Stearns appellants' complaint states that Maine Right to Life Committee PAC and National Right to Life PAC "intend, in the

future, ... to make ... contributions in support of the candidacy of a single candidate for the office of Governor in the State of Maine which aggregate more than $500 in a single election."

**24.** The district court stated: "The election for governor ... is three years away, and no plaintiff in this lawsuit purports to be a candidate for governor. I DISMISS WITHOUT PREJUDICE any challenge to the new gubernatorial contribution limit ($500) as premature." *Daggett,* 81 F.Supp.2d at 129. We interpret this to mean that the court was concerned about both ripeness and standing.

rights of non-participating candidates and those who wish to make independent expenditures by chilling as well as penalizing their speech. Essentially, their argument boils down to a claim of a First Amendment right to outraise and outspend an opponent, a right that they complain is burdened by the matching funds clause.

Appellants further argue that independent expenditures should not be treated as campaign contributions by the statute because independent expenditures have traditionally been afforded broader protection. *See, e.g., Shrink Missouri PAC,* 120 S.Ct. at 904 (expenditure restrictions are a direct restraint on speech while contribution limits are only marginal restrictions on speech (citing *Buckley,* 424 U.S. at 20–21, 96 S.Ct. 612) (footnote omitted)); *National Conservative PAC,* 470 U.S. at 497, 105 S.Ct. 1459 (noting the "fundamental constitutional difference between money spent to advertise one's views independent of the candidate's campaign and money contributed to the candidate to be spent on his campaign"). Appellants also maintain that their freedom of association is eclipsed by this provision because it forces them to be associated with candidates they oppose by in effect facilitating their speech. They urge that even if the Act is found constitutional on whole, this particular provision should be struck.

■ We review the challenged provision of the statute to determine whether it burdens First Amendment rights, and if it does, whether it is narrowly tailored to serve a compelling state interest. *See, e.g., National Conservative PAC,* 470 U.S. at 496, 105 S.Ct. 1459 (determining that there was no "sufficiently strong governmental interest" to support a limit on independent political committee expenditures); *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 967 (8th Cir.1999) (stating that restrictions on independent expenditures are content-based and therefore subject to "most exacting scrutiny" (internal quotations and citations omitted)).

Direct limitations on independent expenditures have been found impermissibly to burden constitutional rights of free expression. *See Buckley,* 424 U.S. at 44, 96 S.Ct. 612; *New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 18–19 (1st Cir.1996) (invalidating New Hampshire statute limiting independent expenditures to $1,000 per election). Such cases are of limited application, however, because they involve direct monetary restrictions on independent expenditures, which inherently burden such speech, while the Maine statute creates no direct restriction.

Moreover, the provision of matching funds does not indirectly burden donors' speech and associational rights. Appellants misconstrue the meaning of the First Amendment's protection of their speech. They have no right to speak free from response—the purpose of the First Amendment is to " 'secure the "widest possible dissemination of information from diverse and antagonistic sources." ' " *Buckley,* 424 U.S. at 49, 96 S.Ct. 612 (citations omitted); *see Pacific Gas & Elec. Co. v. Public Utils. Comm'n,* 475 U.S. 1, 14, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (there exists no right to speak "free from vigorous debate"). The public funding system in no way limits the quantity of speech one can engage in or the amount of money one can spend engaging in political speech, nor does it threaten censure or penalty for such expenditures. These facts allow us comfortably to conclude that the provision of matching funds based on independent expenditures does not create a burden on speakers' First Amendment rights.

Appellants rely heavily on *Day v. Holahan,* 34 F.3d 1356 (8th Cir.1994), in which the Eighth Circuit invalidated Minnesota's campaign finance statute, which increased a participating candidate's expenditure limit based on independent expenditures made against her or for her major party opponent and under some circumstances matched such independent expenditures. *See id.* at 1359–62.[25] The court held that

---

25. The State, as well as amici, assert that *Day*

was called into question by the Eighth Cir-

"[t]o the extent that a candidate's campaign is enhanced by the operation of the statute, the political speech of the individual or group who made the independent expenditure 'against' her (or in favor of her opponent) is impaired." *Id.* at 1360. We cannot adopt the logic of *Day*, which equates responsive speech with an impairment to the initial speaker.[26]

 Further, merely because the Fund provides funds to match both campaign donations and independent expenditures made on behalf of the candidate does not mean that the statute equates the two.[27] Finally, appellants' freedom of association is not burdened because their names and messages are not associated—in any way indicative of support—with the candidate they oppose.

### B. Reporting Requirements

 The Daggett appellants, and notably not the Stearns appellants, challenge the twenty-plus-year-old requirement that independent expenditures aggregating more than $50 for a single election be reported, *see* 21–A M.R.S.A. § 1019. They contend that the reporting requirement, which was modified slightly by the voter referendum, is overly cumbersome and will have a chilling effect on independent

speakers in violation of the First Amendment.

 A disclosure statute requiring revelation of contributions in the political arena is subject to exacting scrutiny and survives only if: "(1) the statute as a whole ... serve[s] a compelling governmental interest, and (2) a substantial nexus ... exist[s] between the served interest and the information to be revealed." *Vote Choice*, 4 F.3d at 32. In other words, there must be a " 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Buckley*, 424 U.S. at 65, 96 S.Ct. 612 (footnotes omitted).

In *Buckley*, the Supreme Court upheld a reporting requirement for independent expenditures in excess of $100 in a calendar year, identifying three "sufficiently important" governmental interests: providing the electorate with information as to who supports a candidate and where political funding comes from, deterring corruption and the appearance thereof by "exposing large contributions and expenditures to the light of publicity," and gathering data essential to detect violations of contribution limits. *See id.* at 66–68, 96 S.Ct. 612. In *Vote Choice*, we explained that the state

cuit's subsequent decision in *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir.1996), which held that a provision waiving the expenditure ceiling for a participating candidate once a non-participating opponent reached a certain threshold did not burden the non-participant's First Amendment rights. *See id.* at 1553. Although *Day* involved independent expenditures while *Rosenstiel* regarded candidate expenditures, the logic of the two cases is somewhat inconsistent. In *Rosenstiel*, the fact that a candidate's expenditure triggered the release of his opponent's spending limitation did not burden his First Amendment rights; yet in *Day*, the fact that a non-candidate's spending triggered matching funds burdened the speaker's First Amendment rights. We recognize that there may be a difference between expenditures by a candidate and those by a non-candidate, but nonetheless agree that the continuing vitality of *Day* is open to question.

26. The district court, while recognizing that its holding could be construed as contrary to

*Day*, distinguished *Day* on the basis that the court there rejected Minnesota's asserted rationale of encouraging participation even though participation rates soared near 100% before independent expenditures were matched. *See Daggett*, 74 F.Supp.2d at 61 n. 8. Were we to reach this step in the analysis, determining whether the statute is supported by a compelling state interest, we would note that Maine has just begun the process of encouraging candidate participation and did not enact the independent expenditure match under a pretext of encouraging participation.

27. Schemes that do equate the two types of speech—for example, the challenged statute in *Iowa Right to Life*, 187 F.3d at 966 n. 3, which deemed an independent expenditure to be coordinated with the candidate unless the candidate specifically disavowed it—are much more likely to infringe on freedom of association.

has a "compelling interest in keeping the electorate informed about which constituencies may command a candidate's loyalties." *Vote Choice*, 4 F.3d at 32.

The challenged statute requires reporting of expenditures totaling more than $50 in an election, to include the date and purpose of each expenditure and the name of each payee or creditor (if total expenditures exceed $500), an explanation of whether the expenditure was in support of or opposition to a candidate, and a statement under oath or affirmation as to whether the expenditure was made in concert with, or with the coordination or suggestion of, any candidate. *See* 21–A M.R.S.A. § 1019.

The Daggett appellants contend that no government interest is served by the reporting requirement in this case, because the threshold amount is too low and the State's interest in deterring corruption, in particular, is not met because expenditures of only $50 could not possibly lead to corruption. We find, however, that the interests defined in *Buckley* and *Vote Choice* are present to support Maine's statute. The reporting requirement allows voters access to information about who supports a candidate financially and it allows the Commission to effectively administer the matching funds provision of the Act. Further, it deters corruption and its appearance. Whether a $100 threshold would be equally effective, we cannot say; as we explained in *Vote Choice*, such determinations are "best left to legislative discretion" and will be deferred to unless " 'wholly without rationality.' " *See Vote Choice*, 4 F.3d at 32 (quoting *Buckley*, 424 U.S. at 83, 96 S.Ct. 612). Moreover, the reporting requirements have a "relevant correlation" or a "substantial relation" to the government interests; the modest amount of information requested is not unduly burdensome and ties directly and closely to the relevant government interests. We remain unconvinced, as was the district court, that, if $100 was an appropriate threshold for requiring the reporting of independent expenditures in federal elec-

tions in *Buckley*, $50 is an illegitimate threshold for Maine elections.

## IV. *Public Financing System*

Throughout this litigation, the Daggett appellants' overarching argument has been that the public funding scheme embodied in the Maine Clean Election Act is unconstitutional because it is impermissibly coercive—that is, it provides so many incentives to participate and so many detriments to foregoing participation that it leaves a candidate with no reasonable alternative but to seek qualification as a publicly funded candidate. We have already addressed the independent constitutionality of contribution limits and matching funds for independent expenditures, and now turn to consider whether the elements of the system, considered as a whole, create a situation where it is so beneficial to join up and so detrimental to eschew public funding that it creates coercion and renders a candidate's choice to pursue public funding essentially involuntary. Because the parties present only issues of law, we review the district court's judgment *de novo*. *See Vote Choice*, 4 F.3d at 31, 38 (citing *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 396 (1st Cir.1993)).

The Supreme Court established conclusively in *Buckley* that "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specific expenditure limitations." *Buckley*, 424 U.S. at 57 n. 65, 96 S.Ct. 612 (determining that public financing scheme for federal elective offices was not inconsistent with the First Amendment).

Although public financing is not inherently unconstitutional, it may be so if it "burdens the exercise of political speech" but is not "narrowly tailored to serve a compelling state interest." *See Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (considering restrictions on corporate political expendi-

tures, citing *Buckley*, 424 U.S. at 44–45, 96 S.Ct. 612); *Vote Choice*, 4 F.3d at 39 (suggesting that the court first considers whether First Amendment rights are burdened, and if so, determines whether the burdening statute is narrowly tailored to support a compelling governmental interest). Thus, we determine in the first instance whether appellants' First Amendment rights are burdened.

In *Vote Choice*, this court's primary public funding case, we indicated that the appropriate benchmark of whether candidates' First Amendment rights are burdened by a public funding system is whether the system allows candidates to make a "voluntary" choice about whether to pursue public funding. *See Vote Choice*, 4 F.3d at 38 ("[V]oluntariness has proven to be an important factor in judicial ratification of government-sponsored campaign financing schemes." (citing *Buckley*, 424 U.S. at 95, 96 S.Ct. 612; *Republican Nat'l Comm. v. Federal Election Comm'n*, 487 F.Supp. 280, 285 (S.D.N.Y.), *aff'd mem.*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980))); *see also Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552–53 (8th Cir.1996) (upholding public funding system when it did not impose a burden on candidates because it was not coercive). We explained that the government may create incentives for candidates to participate in a public funding system in exchange for their agreement not to rely on private contributions. *See Vote Choice*, 4 F.3d at 38–39.

A law providing public funding for political campaigns is valid if it achieves "a rough proportionality between the advantages available to complying candidates ... and the restrictions that such candidates must accept to receive these advantages." *Id.* at 39 ("Put another way, the state exacts a fair price from complying candidates in exchange for receipt of the challenged benefits."). "[A]s long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate the First Amendment rights of the candidate or supporters." *Republican Nat'l Comm.*, 487 F.Supp. at 284.

Appellants argue that Maine's public financing system is involuntary because it not only deprives non-participants of the benefits of participation, but also penalizes them for not participating. They contend that the balance is weighted too heavily in favor of encouraging participation, and that, in practice, it provides no meaningful choice. Appellants highlight the matching funds provision and the potential labeling of participating candidates as "clean" by the Commission as particular elements of the public funding scheme that are too beneficial for publicly funded candidates.[28] Appellants also argue that the funding formula will leave participating candidates with funding that is woefully inadequate, stating that it is "barely sufficient to run an unsuccessful—much less competitive—campaign in the great majority of cases." They assail us with statistics as to the average amount spent by various gubernatorial and legislative candidates over the last decade, in comparison with what they claim are the paltry sums disbursed to participating candidates. This line of reasoning, however, cuts strongly against appellants' argument that the statute is coercive because if the sums are unreasonably low, they will not attract, much less coerce,

28. Before the district court, appellants also complained of the Act's allocation of funding for primary elections, *see* 21-A M.R.S.A. § 1125(7)(A) & (B), and various reporting requirements, *see id.* § 1017(3–B), but they do not pursue these avenues on appeal. Appellants do, however, complain that the amount of the subsidy for a participating candidate does not reflect his popularity. It is not a requirement of public funding, however, that it be equated to "popularity." Correspondingly, the amount of speech undertaken by a privately funded candidate is not reflective of her popularity. Campaign contributions are symbolic of support, *see Buckley*, 424 U.S. at 20–21, 96 S.Ct. 612, but do not correspond dollar-for-dollar with popularity level, and large contributions as well as the candidate's use of personal funds skew the speech-equals-popularity equation.

participation. We look at the provisions highlighted as problematic by appellants first, then evaluate the statute as a whole.

### A. *Matching Funds*

■ We have already addressed the specific argument that providing matching funds to correspond to independent expenditures unfairly burdens a speaker's First Amendment speech and association rights. We now address appellants' claim that the matching funds provision penalizes non-participating candidates for raising money beyond that amount initially distributed to their participating opponents and allows participants to effectively bypass the spending limitation that is the only significant burden of participation.

Appellants argue that the matching funds provision is intended to thwart attempts by non-participating candidates to outspend their participating opponents. Appellants contend that non-participating candidates are unlikely to receive as many direct contributions because donors will not wish to give, knowing that their donations could result in additional funding for the participating opponent. They also complain about the fact that matching funds are allocated based on contributions to, as opposed to expenditures by, the non-participating opponent. They suggest that this is illegitimate for several reasons, all reflective of the fact that a non-participating candidate might spend contributions on something other than her campaign or create a reserve and the matching funds allegedly remove flexibility in the use of surplus funds.

Appellants also claim that, in the context of the scheme as a whole, allocating matching funds to correspond to independent expenditures is unfair because the participating candidate, by receiving funds to correspond to expenditures over which the non-participating opponent has no control, effectively procures a larger pool of funds to work with than the non-participating opponent. They allege that this provision will result in fewer independent expenditures on behalf of non-participating opponents.[29]

We cannot say, however, that the matching funds create an exceptional benefit for the participating candidate. Maine's Act does not provide an unlimited release of the expenditure ceiling—it allocates matching funds for the participating candidate of only two times the initial disbursement. Thus, a non-participating candidate retains the ability to outraise and outspend her participating opponent with abandon after that limit is reached. Further, the non-participating candidate holds the key as to how much and at what time the participant receives matching funds.

The appellants' expert on campaign strategy, Jay Hibbard, revealed a downside of the matching funds bonus. He attested that "[c]ontributions and spending can be easily timed to avoid the effective release of matching funds, and therefore, thwart the objectives of the MCEA." Indeed, he added, heavy expenditures take place in the last ten days of a campaign. This is when attack ads occur and direct mail is timed to preclude a response before election. Moreover, the participating candidate, not having any way of foreseeing the timing or amounts of any matching funds, is unable to budget, to commit time

---

29. Although appellants contend that it is inequitable not to deduct independent expenditures made on behalf of the participating candidate from the initial disbursement, the regulations require that the sum of independent expenditures made expressly advocating the defeat of the non-participating opponent or the election of the certified candidate be deducted from the participating candidate's disbursement of matching funds. *See* Commission on Governmental Ethics and Election Practices, Regulations Regarding Maine Clean Election Act and Related Provisions, ch. 3, § 6.3.B(2). Although independent expenditures made on behalf of a participating candidate or against his opponent are not counted against him until his opponent raises funds in excess of his initial disbursement, this is necessary to prevent a participating candidate's already modest initial disbursement from being substantially diminished or even obliterated by independent expenditures.

for radio or television, or to plan, produce, or distribute printed material. Although we may deem an overstatement Hibbard's opinion that "the matching fund mechanism has been rendered meaningless," we can acknowledge the diminished utility of a belated trigger. Finally, in view of the initial moderate allowance, without the matching funds, even though they are limited in amount, candidates would be much less likely to participate because of the obvious likelihood of massive outspending by a non-participating opponent. As the State explained, the matching funds provision allows it to effectively dispense limited resources while allowing participating candidates to respond in races where the most debate is generated.[30]

Although no two public funding schemes are identical, and thus no two evaluations of such systems are alike, we derive at least general support from other courts' evaluations of trigger provisions. In *Gable v. Patton*, 142 F.3d 940 (6th Cir.1998), the Sixth Circuit upheld a Kentucky statute that was clearly more beneficial than Maine's—participating candidates received a two-for-one match for private contributions raised, without any limitation. *See id.* at 947–49. Moreover, the Kentucky statute released a slate of publicly financed gubernatorial candidates from both expenditure limitations and a ban on accepting contributions within twenty-eight days of an election if non-participating opponents raised more than the initial expenditure limit for the participating candidates. *See id.* at 944. Even though the trigger provision provided a "substantial advantage" for publicly funded candidates, the court concluded that it did not rise to the level of coerciveness. *See id.* at 948–49 ("Absent a clearer form of coercion, we decline to find that the incentives inherent in the Trigger

provision are different in kind from clearly constitutional incentives.").[31]

Other systems include trigger provisions that waive a participating candidate's expenditure limit once her non-participating opponent reaches a given threshold of contributions or expenditures, but allow the candidate to seek private funding rather than disbursing additional public funding. In *Rosenstiel*, the Eighth Circuit characterized the waiver of the expenditure limit in Minnesota's campaign finance law as "simply an attempt by the State to avert a powerful disincentive for participation in its public financing scheme: namely, a concern of being grossly outspent by a privately financed opponent with no expenditure limit." *Rosenstiel*, 101 F.3d at 1551. The court determined that the trigger provision was not coercive because it allowed a non-participating candidate to control his participating opponent's funding in a sense because it enabled him to raise funds up to a certain level before the matching funds were triggered. *See id.* In *Wilkinson v. Jones*, 876 F.Supp. 916 (W.D.Ky.1995), a district court denied a request for an injunction against Kentucky's election financing statute that contained a similar waiver provision. *See id.* at 926–28 (assuming for the purpose of argument that the trigger provision chilled speech to some degree, the court found that the statutes were narrowly tailored to a compelling state interest).

With regard to matching funds corresponding to independent expenditures, we think that this contributes to any alleged coerciveness in only a minuscule way—that is, it will not play a measurable role in a candidate's decision to seek public funding because it is of such minimal proportion to the other aspects of the system. Further, if the state structured public funding with a blind eye to independent expenditures,

---

**30.** This is also the response to appellants' subsidiary complaint that the matching funds should be keyed to expenditures rather than contributions.

**31.** In *Vote Choice*, we upheld Rhode Island's public funding scheme, which contained a

trigger provision allowing matching funds corresponding to privately raised contributions up to $750,000 for participating gubernatorial candidates, although the trigger provision was not specifically challenged. *See Vote Choice*, 4 F.3d at 28–30, 36–43.

such expenditures would be capable of defeating the state's goal of distributing roughly proportionate funding, albeit with a limit, to publicly funded candidates.

### B. *Labeling*

■ Next, appellants prophesy that the Commission will label participating candidates as "clean," thereby creating an impermissible government endorsement that skews electoral dialogue by violating a principle of neutrality. They argue that the plain language of the statute requires the Commission to certify a candidate as a "Maine Clean Election Act candidate," and they declare that the labeling of participating candidates as "clean" is the most "ominous" aspect of the system.

Our review of the statute clarifies that it does not require the Commission, or anyone else, to classify candidates as "clean," and in fact, it refers to candidates as "participating" and "non-participating." *See, e.g.,* 21–A M.R.S.A. § 1122(5) & (6) (defining "nonparticipating candidate" and "participating candidate"). The statute merely requires that a candidate be "certified," presumably either as a "Maine Clean Election Act candidate" or a "participating candidate," *see id.* § 1125(5), and further, the Commission has attested that it does not intend to tout participating candidates as "clean." [32] Others may use pejorative labels for non-participating candidates, and they may just as easily use derogatory terms for participating candidates; on the other hand, participating candidates might call themselves "clean candidates." Be that as it may, such labeling is not required or sanctioned by the statute nor within the authority of the statute to control. For these reasons, any labeling performed by the Commission will not serve as a substantial benefit to participating candidates.

### C. *Cumulative Effect: Coerciveness*

■ We now step back and look at the Maine public funding/matching funds/contribution limits system as a whole to see if the cumulative effect can be said to be impermissibly coercive. We have previously expressed that a "state need not be completely neutral on the matter of public financing of elections" and that a public funding scheme need not achieve an "exact balance" between benefits and detriments. *See Vote Choice,* 4 F.3d at 39 ("[W]e suspect that very few campaign financing schemes ever achieve perfect equipoise."). In fact, "a voluntary campaign finance scheme must rely on incentives for participation, which, by definition, means structuring the scheme so that participation is usually the rational choice." *Gable,* 142 F.3d at 949. Nevertheless, "there is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive." *Vote Choice,* 4 F.3d at 38, 39 ("Coerced compliance with any fundraising caps and other eligibility requirements would raise serious, perhaps fatal, objections to a system . . . ."). The question before us is whether the "tilt" rises to the level of a coercive penalty.

In determining whether the net advantage to a participating candidate is so great as to be impermissibly coercive, we look both to cases where coerciveness has been found and those where the funding and contribution limits system has been upheld. In *Wilkinson,* a district court enjoined the enforcement of contribution limits that were lower, by a ratio of five-to-one, for non-participating candidates than participating candidates because the limits were so low for non-participating candidates that they constituted an unacceptable penalty for foregoing public financing. *See Wilkinson,* 876 F.Supp. at 929. [33] In

---

**32.** We take note of the fact that in the Commission's explanatory publication for candidates it uses the terms "participants" and "non-participants." *See Candidate's Guide.*

**33.** The court remarked that, in application, the $100/$500 disparity between the contribution limits for participating and non-participating candidates translated into a 15-to-1 ratio between participants and non-participants because participants received a 2-to-1 match for every dollar raised; in other words, a participant would raise the same amount with 1,200 donors giving the maximum that a

*Shrink Missouri Government PAC v. Maupin,* 71 F.3d 1422 (8th Cir.1995), the Eighth Circuit held that a ban on contributions from political action committees and other organizations to privately funded candidates was unconstitutional because it prevented privately funded candidates from gaining access to funding sources to which they would be entitled but for the choice to eschew public funding and its expenditure limitations. *See id.* at 1425–26. The statutes at issue in both of these cases, however, created much harsher repercussions for non-participating candidates than the MCEA.

On the other hand, statutes creating an array of benefits even more enticing to candidates than the MCEA have been upheld. In *Vote Choice,* Rhode Island's public funding system was upheld when it disbursed matching funds for private donations up to a given ceiling, it waived the expenditure ceiling to the extent that a non-participating candidate exceeded it, it allowed a participant to raise donations in increments double that allowed for a non-participant, and it granted a participant free air time on community television stations. *See Vote Choice,* 4 F.3d at 38–40. In *Gable,* the court upheld Kentucky's arrangement, which granted participants a two-to-one match for all private dollars raised up to a certain expenditure limit and released the limit and continued to match funds at the two-to-one ratio after non-participating opponents collected more than the expenditure limit. *See Gable,* 142 F.3d at 947–49. In *Rosenstiel,* the Eighth Circuit upheld Minnesota's public funding system, which disbursed public subsidies for up to half of the expenditure ceiling, allowed taxpayer refunds of up to $50 for donations to participating candidates but not for donations to non-participating candidates, and completely released participants from expenditure limits after a non-participating opponent raised more than a certain percentage of the limit. *See Rosenstiel,* 101 F.3d at 1546–57.

Turning to Maine's system, we first observe that the benefits for a participating candidate are accompanied by significant burdens. The benefits to the candidate include the release from the rigors of fundraising, the assurance that contributors will not have an opportunity to seek special access, and the avoidance of any appearance of corruption. More peripheral benefits include the ability to bypass a small number of additional reporting requirements, *see* 21–A M.R.S.A. § 1017(3–B), and the opportunity to be free of the reduced contribution limits imposed on private contributions.

In order to gain these benefits, however, the candidate must go through the paces of demonstrating public support by obtaining seed money contributions as well as a substantial number of $5 qualifying contributions. Additional detriments include the limited amount of public funding granted in the initial disbursement; the uncertainty of whether and when additional funds will be received based on an opponent's fundraising; the ultimate cap on matching funds; and the foreclosure of the option of pursuing any private campaign funding or spending any monies above those disbursed by the Commission.

With regard to the contribution limits, we do not believe that they serve as a coercive penalty for non-participating candidates. Until the privately funded candidate reaches the funding level equivalent to the initial disbursement granted to his participating opponent, the contribution limits may serve to the disadvantage of the privately funded candidate. Nevertheless, once the privately funded candidate exceeds that initial disbursement level of his opponent and until he reaches the level at which his opponent's matching funds run out, the contribution limits work to the detriment of both candidates because the less the privately funded candidate raises the less his participating opponent receives in matching funds.

non-participant would with 18,000 donors. *See Wilkinson,* 876 F.Supp. at 929.

In conclusion, the incentives for a Maine candidate, as the district court characterized them, are "hardly overwhelming." Despite appellants' contention that a participating candidate cedes nothing in exchange for public funding, there are in fact significant encumbrances on participating candidates. The constraints on a publicly funded candidate, we think, would give significant pause to a candidate considering his options. In fact, appellant Representative Elaine Fuller has attested that she will not seek certification and appellant Senator Beverly Daggett has not yet decided. We also take note of the Commission figures that, as of February 8, halfway through the qualifying period, 27.5% of 142 legislative candidates have filed declarations of intent to seek public funding; on the other hand, at least 38, or roughly 26.7%, of the candidates have received contributions or made expenditures in excess of seed money limitations, signaling a desire not to seek certification. Thus, we hold that Maine's public financing scheme provides a roughly proportionate mix of benefits and detriments to candidates seeking public funding, such that it does not burden the First Amendment rights of candidates or contributors.

We add a final call for vigilant monitoring. In this case we necessarily regard appellants' claims as facial challenges to the public funding system and contribution limits. Although we indicate no opinion as to the success that an as-applied challenge would meet in the future, that door remains open. *See Citizens for Responsible Gov't State Political Action Comm. v. Buckley,* 60 F.Supp.2d 1066, 1073 (D.Colo. 1999) ("An 'as applied' challenge . . . asserts that the statute is unconstitutional as applied to a particular plaintiff's speech activity, even though the statute may be valid as applied to other parties."). Experience, after all, will be our best teacher.

### V. *Conclusion*

We conclude, first, that contribution limits for House and Senate candidates in Maine and matching funds corresponding to independent expenditures are independently constitutional aspects of Maine's public financing scheme. Further, we decide that the challenge to the limits on contributions to Maine's gubernatorial candidates was properly dismissed without prejudice due to appellants' lack of standing. Finally, we hold that Maine's public funding scheme for candidates seeking state office, embodied principally in the Maine Clean Election Act, does not violate the First Amendment rights of candidates or campaign contributors.

*Affirmed.*